YOLANDA SAN MIGUEL LORENZANA, demandante y apelante, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO y OTROS, demandados y apelados.

*Número:* CE-86-671 *Resuelto:* 1ro de noviembre de 1993

*Fernando Pérez Carrión Colón*, de *Lespier, Muñoz Noya & Ramírez*, abogado de la apelante; *Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General, Dora T. Peñagarícano, Rose Mary Corchado Lorent,* y *Lorenzo Vilanova Alfonso, Procuradores Generales Auxiliares*, abogados de El Pueblo.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

En el presente caso debemos resolver si es inconstitucional el Art. 9.070(2) del Código de Seguros de Puerto Rico, Ley Núm. 77 de 19 de junio de 1957, según enmendada, 26 L.P.R.A. sec. 907(2). Este artículo impone limitaciones a la obtención de licencia para trabajar como agente de seguros.

*Hechos*

El 30 de marzo de 1984 la Sra. Yolanda San Miguel Lorenzana, Catedrática Auxiliar de la Facultad de Humanidades de la Universidad de Puerto Rico, Recinto de Río Piedras, solicitó una licencia de agente de seguros de vida e incapacidad ante la Oficina del Comisionado de Seguros de Puerto Rico. Mediante Carta de 17 de abril de 1984, el Jefe de la División de Licencias y Exámenes de la Oficina del Comisionado de Seguros le denegó la licencia a la señora San Miguel Lorenzana por razón de la prohibición del Art. 9.070(2) del Código de Seguros de Puerto Rico, *supra*. Dicho artículo prohíbe al Comisionado de Seguros (en adelante Comisionado) expedir licencia de agente, agente general, corredor, solicitador, ajustador o consultor a cualquier persona que sea funcionario o empleado del Gobierno de Estados Unidos, o del Estado Libre Asociado de Puerto Rico, o de cualquiera de sus dependencias, municipios, escuelas públicas, colegios públicos u otra subdivisión política.

No conforme con esta denegatoria, en enero de 1985 la señora San Miguel Lorenzana presentó una nueva solicitud de licencia. Además, solicitó al Comisionado una vista administrativa con el propósito de dilucidar la validez constitucional del Art. 9.070(2), *supra*. El 1ro de abril de 1985 el Comisionado denegó la solicitud de vista. Este señaló que su oficina no era el foro apropiado para ventilar la controversia constitucional planteada.

Así las cosas, el 2 de agosto de 1985, la señora San Miguel Lorenzana presentó demanda de sentencia declarato-

ria ante el Tribunal Superior, Sala de San Juan, alegando la inconstitucionalidad del Art. 9.070(2) del Código de Seguros de Puerto Rico, *supra*. Al no existir controversia de hechos que dilucidar,[1] el caso fue sometido por memorandos de derecho. La demandante planteó, en síntesis, que la disposición legal en controversia crea una presunción irrefutable de naturaleza inconstitucional y que viola, además, su derecho al trabajo, por lo que debe ser evaluada a la luz del escrutinio estricto. El Estado, por su parte, argumentó que esta disposición del Código de Seguros de Puerto Rico reglamenta una actividad económica, cuya validez constitucional es incuestionable de acuerdo con los principios del escrutinio tradicional.

El tribunal de instancia aplicó el escrutinio tradicional y dictó sentencia declarando válido y constitucional el Art. 9.070(2) del Código de Seguros de Puerto Rico, *supra*; en consecuencia, desestimó la demanda e impuso el pago de costas a la demandante. Fundamentó su determinación en que "la disposición legal impugnada no priva a la demandante de su derecho al trabajo ya que ella se desempeña actualmente como profesora universitaria y puede dedicarse a cualquier otro oficio o profesión no conflictiva con su trabajo y que no le esté vedado vía reglamentación o por disposición legal". Así justificó la aplicación del escrutinio tradicional.

El tribunal sostuvo que "[l]a intención legislativa al redactar el inciso 2 del referido Artículo 9.070 del Código de Seguros fue evitar que exista ventaja indebida y/o una relación o acceso preferente a favor de los empleados públicos que fueran poseedores de licencia de agente o corredor de seguros, en detrimento de otros tenedores de licencia que no tienen la accesibilidad al público y la relación con ese público que tienen los mencionados empleados públicos". También indicó que es imposible "sustraernos de la reali-

---

[1] La única razón para denegar la solicitud de la Sra. Yolanda San Miguel Lorenzana fue por ser ésta empleada de la Universidad de Puerto Rico.

dad de que, aún cuando altamente impropio, la prestación de los servicios podría estar condicionada directa o indirectamente por otras consideraciones como podría resultar el hecho de que quien los reciba coloque su negocio de seguros con el funcionario que le brindó el servicio público o que le facilitó su obtención". En resumen, su decisión al decretar la constitucionalidad del Art. 9.070(2) se fundó principalmente en que la prohibición que éste establece evita la competencia desleal en el negocio de los seguros.

Inconforme con esta determinación, la demandante presentó escrito de apelación. En éste planteó las controversias siguientes:

### A–*Primera Cuestión*

La prohibición absoluta que contiene el Artículo 9.070 del Código de Seguros de Puerto Rico (26 L.P.R.A. 907) en su inciso segundo y que priva entre otros a los funcionarios o empleados del Estado Libre Asociado de Puerto Rico, o de cualquiera de sus dependencias, o de un municipio, escuela pública o colegio público, u otra subdivisión política, de obtener entre otras, licencia de agente de seguros en esta jurisdicción, es irrazonable, arbitraria, discriminatoria y crea una presunción irrefutable por lo que riñe y es contraria a los principios constitucionales contenidos en el artículo II, Secciones 7 y 16, de la Constitución del Estado Libre Asociado de Puerto Rico y en violación de la Enmienda 14 de la Constitución de los Estados Unidos de América.

### B–*Segunda Cuestión*

Por estar envuelto un derecho fundamental expresamente consignado en la Constitución del Estado Libre Asociado de Puerto Rico, el derecho al trabajo, procede que al analizar el presente caso el jugador [sic] aplique la fórmula de estricta supervisión judicial, también conocida como análisis de escrutinio estricto, y no la prueba tradicional de razonabilidad que utilizó el tribunal apelado.

Antes de pasar a examinar estos planteamientos, expondremos aquellas normas relativas al poder del Estado para reglamentar el ejercicio de las profesiones u oficios.

# I

■ Desde hace mucho tiempo hemos reconocido que no existe un derecho absoluto al ejercicio de las profesiones u oficios. *Infante v. Junta de Médicos Exam. de P.R.*, 43 D.P.R. 325, 330 (1932). Éstas están subordinadas al poder de reglamentación del Estado. *Alonso v. Tribl. Examinador de Médicos*, 74 D.P.R. 158, 164 (1952). Éste regula las profesiones u oficios en ejercicio de su poder de razón de Estado (*police power*) para proteger el bienestar público. En este sentido nos expresamos recientemente.

> En el ejercicio de su poder regulador (*police power*), el Estado tiene facultad para regular y controlar la práctica de las profesiones a fin de proteger la salud y el bienestar público, a la vez que evita el fraude y la incompetencia. También puede prohibir la práctica de una profesión, a menos que primero se obtenga una licencia, permiso o certificado de alguna entidad u oficial examinador. *Col. Ing. Agrim. P.R. v. A.A.A.*, 131 D.P.R. 735, 763 (1992). Véanse, además: *Cedeño v. Junta Dental*, 79 D.P.R. 549, 553 (1956); *Castillo v. Tribl. Examinador*, 81 D.P.R. 746, 747 (1960).

Uno de los aspectos que cubre este tipo de reglamentación es el "de los requisitos para la admisión al ejercicio de la profesión". *Pérez v. Junta Dental*, 116 D.P.R. 218, 233 (1985). "Ello incluye la comprobación de conocimientos indispensables y la necesaria solvencia moral del candidato." *De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472, 487 (1989). Hemos resuelto que estos requisitos "no privan a los ciudadanos de sus profesiones sino que las regulan por razones del eminente interés público de que están revestidas". *Asoc. Drs. Med. Cui. Salud v. Morales*, 132 D.P.R. 567, 586 (1993). Véase, además, *Román v. Trib. Exam. de Médicos*, 116 D.P.R. 71, 77 (1985).

■ El Estado tiene amplia discreción en la fijación e implantación de normas y procedimientos relativos a la admisión al ejercicio de profesiones u oficios. *Asoc. Drs. Med. Cui. Salud v. Morales*, supra. Sin embargo, en el ejercicio

de su discreción no puede violentar los derechos constitucionales de los aspirantes. *Pueblo v. Rodríguez Alberty*, 39 D.P.R. 599, 601–602 (1929).

Al reglamentar el acceso a una profesión el Estado no puede excluir aspirantes de forma, o por motivos que violenten el debido proceso de ley y la igual protección de las leyes. El Estado puede establecer unos requisitos de conocimientos mínimos, capacidad, destreza, entereza moral o cualquier otra calificación que esté racionalmente relacionada con el objetivo de garantizar que los admitidos posean la competencia para practicar la profesión en forma adecuada. (Citas omitidas.) *Santiago v. Trib. Exam. de Médicos*, 118 D.P.R. 1, 6 (1986).

Al examinar estas normas, el tribunal tiene que velar porque las mismas no nieguen arbitrariamente la admisión a los aspirantes por motivos ajenos al propósito de la reglamentación. Basta que exista alguna evidencia de que éstas son racionales para sostener su validez. *Román v. Trib. Exam. de Médicos*, supra, pág. 80.

■ El negocio de seguros está investido de substancial interés público. *Maryland Cas'y Co. v. San Juan Rac'g Assoc., Inc.*, 83 D.P.R. 559, 563 (1961); *Comisionado v. Anglo Porto Rican*, 97 D.P.R. 637, 640 (1969); *Comisionado de Seguros v. Tribunal Superior*, 100 D.P.R. 546, 553 (1972). Por esto el Estado tiene un legítimo interés en reglamentarlo. *Comisionado de Seguros v. Bradley*, 98 D.P.R. 21, 29 (1969). Uno de los aspectos de esta reglamentación lo constituye la imposición del requisito de licencia para poder actuar como agente de seguros. 3 *Couch on Insurance 2d* Sec. 26.3: 492–493 (1984).

Since the insurance business is quasi public, the state may regulate and control such business and those engaged therein under its police power by enacting laws prescribing and fixing insurance agents' qualifications, requiring them to obtain registration certificates and licenses, and authorizing revocation of such licenses for cause. Similarly, statutes concerning the qualifications of brokers and requiring them to be licensed are valid as a proper exercise of the legislative powers. (Escolios

omitidos.) 16 *Appleman*, *Insurance Law and Practice* Sec. 8633, págs. 6–7 (1981).

El propósito principal del requisito de licencia es proteger al público. Appleman, *supra*, Sec. 8632, pág. 5. Este requisito garantiza a los consumidores que las personas que poseen licencia de agente de seguros están adecuadamente calificadas para ese trabajo. Íd.

■ El Art. 9.070 del Código de Seguros de Puerto Rico, *supra*, cuyo inciso 2 la apelante impugna, regula el requisito de licencia para agente de seguros y otros. Nos corresponde determinar si el Estado ejerció inconstitucionalmente su poder para reglamentar la profesión de agente de seguros. A ese fin examinaremos los planteamientos antes mencionados.

## II

La apelante señala como primera cuestión que el Art. 9.070(2) del Código de Seguros de Puerto Rico, *supra*, crea una presunción irrefutable o incontrovertible. Además, expone que la misma es contraria a las garantías expuestas en las Secs. 7 y 16 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A. Tomo 1, y la Emda. 14 de la Constitución de Estados Unidos, L.P.R.A., Tomo 1.

■ El término "presunción irrefutable o incontrovertible" se utiliza para designar un método de análisis constitucional creado por el Tribunal Supremo de Estados Unidos. Éste se ha usado en el examen de clasificaciones a base de las cuales se conceden beneficios o se imponen cargas a las personas. Nota, *The Irrebuttable Presumption Doctrine in the Supreme Court*, 87 Harv. L. Rev. 1534 (1974).

■ Este análisis dispone que la clasificación se examinará a base de los elementos de las presunciones, entiéndase, hecho básico y hecho presumido. Véase E.L.

Chiesa, *Sobre la validez constitucional de las presunciones*, 14 Rev. Jur. U.I.A. 727, 731 (1980). La característica objeto de la clasificación constituye el hecho básico. Una vez se corrobora la presencia del hecho básico hay que inferir el hecho presumido. No existe discreción al respecto. Chiesa, *supra*, págs. 731–732. En virtud de esta inferencia el Estado pasa a imponer cargas o a denegar beneficios, según disponga la clasificación.

Veamos la aplicación de este método de análisis con un ejemplo obtenido de la opinión de *Cleveland Board of Education v. LaFleur*, 414 U.S. 632 (1974). Allí una reglamentación escolar requería que las maestras embarazadas se acogieran a una licencia sin sueldo tan pronto llegaran al quinto mes de embarazo. Esta regla creaba una clasificación entre maestras con cinco (5) meses de embarazo y las demás maestras. El hecho básico lo constituían las maestras con cinco (5) meses de embarazo. La carga o sanción que imponía la clasificación era que éstas no podían ejercer su trabajo. Además, no devengarían su sueldo durante el tiempo que, por compulsión de la regla, estuvieran sin trabajar. Por lo tanto, en esta clasificación el hecho presumido lo constituía la concepción de que las maestras con cinco (5) meses de embarazo eran inhábiles para ejercer el magisterio. *Cleveland Board of Education v. LaFleur*, supra, Debido a que la clasificación estaba concebida y diseñada en términos extremadamente amplios y abarcadores, *toda* maestra con cinco (5) meses de embarazo (hecho básico) era considerada inhábil para desempeñar su trabajo (hecho presumido) y, por consiguiente, tenía que acogerse a una licencia sin sueldo (sanción o carga impuesta).

▪ El análisis de la presunción irrefutable va dirigido a determinar si este tipo de clasificación está constitucionalmente justificada. Para ello requiere que la clasificación se fundamente en un interés o propósito legítimo. Una vez el Estado demuestra esto, el tribunal pasa a examinar:

1. si el hecho presumido es "como cuestión de hecho necesario y universalmente cierto" y

2. si el Estado tiene otras alternativas razonables para determinar la existencia del, hasta ahora, hecho presumido. *Cleveland Board of Education v. LaFleur*, supra.

Estos criterios van dirigidos a establecer si las personas perjudicadas por la clasificación, es decir, aquellas a las que se les ha impuesto cargas o denegado beneficios, en realidad satisfacen el hecho presumido. De no ser así, se les estaría imponiendo una carga que no ha sido diseñada para casos como los suyos. Además, en estos casos la imposición de la sanción no adelantaría los propósitos de la clasificación.

El primer criterio de este examen requiere una determinación de si, en todos los casos, el hecho presumido existe en realidad. Por ejemplo, que todas las maestras con cinco (5) meses de embarazo son, real y efectivamente, inhábiles para desempeñar su trabajo. Si el tribunal decide en la afirmativa, se mantiene la constitucionalidad de la clasificación. Si llega a una conclusión contraria, procede entonces pasar a considerar el segundo criterio.

En éste lo que hay que determinar es si la presunción incontrovertible, inherente a la clasificación, es el único medio disponible al Estado para constatar la presencia del hecho presumido. De no ser así, procede, entonces, ponderar si son razonables las medidas alternas que tiene el Estado para hacer esa determinación. Estas medidas consisten de exámenes individualizados de las personas a las que aplica la clasificación a fin de determinar si para cada caso particular el hecho presumido existe. Uno de los mecanismos que se ha utilizado para hacer este examen individualizado es la vista administrativa. En ésta la persona perjudicada por la clasificación tiene oportunidad de impugnarla mediante prueba demostrativa de que, en su caso, el hecho presumido no está presente. Si el tribunal concluye que el hecho presumido no es, como cuestión de hecho, necesario y universalmente cierto, y que existen

otros medios razonables para determinar su existencia, declarará la clasificación inconstitucional por violar la garantía del debido proceso de ley. Nota, *The Irrebutable Presumption Doctrine in the Supreme Court*, supra.

En el caso de las maestras embarazadas se examinó si la presunción de inhabilidad al llegar al quinto mes de embarazo era la única manera de determinar qué maestras no podían ejercer su trabajo debido a su embarazo. Además, se consideró si existían otros medios razonables para que el Estado hiciera esta determinación.

En el caso de *Cleveland Board of Education v. LaFleur*, supra, el Estado alegó que la clasificación se fundamentaba en dos (2) intereses legítimos. En primer lugar, mantener la continuidad de la enseñanza. Al saber la fecha específica en que la maestra embarazada dejará de trabajar, se hace más fácil encontrar y reclutar a un sustituto calificado. En segundo lugar, proteger la salud de la maestra, de su hijo; y asegurarle a los estudiantes que tendrán una maestra físicamente capaz para atenderlos en todo momento. El Tribunal determinó que ambos intereses o propósitos eran legítimos.

Sin embargo, en cuanto al hecho presumido, que las mujeres con cinco (5) meses de embarazo son inhábiles para ejercer el magisterio, el Tribunal concluyó que éste no era como cuestión de hecho necesaria y universalmente cierto.

The mandatory termination provisions of the Cleveland and Chesterfield County rules surely operate to insulate the classroom from the presence of potentially incapacitated pregnant teachers. But the question is whether the rules sweep too broadly. That question must be answered in the affirmative, for the provisions amount to a conclusive presumption that every pregnant teacher who reaches the fifth or sixth month of pregnancy is physically incapable of continuing. There is no individualized determination by the teacher's doctor —or the school board's— as to any particular teacher's ability to continue at her job. *The rules contain an irrebuttable presumption of physical incompetency, and that presumption applies even when the medical evidence as to an individual woman's physical status*

*might be wholly to the contrary.*

. . . . . . . . .

While the medical experts in these cases differed on many po-
ints, they unanimously agreed on one—*the ability of any parti-
cular pregnant woman to continue at work past any fixed time
in her pregnancy is very much an individual matter.* Even as-
suming, *arguendo,* that there are some women who would be
physically unable to work past the particular cutoff dates em-
bodied in the challenged rules, it is evident that there are large
numbers of teachers who are fully capable of continuing work
for longer than the Cleveland and Chesterfield County regula-
tions will allow. Thus, *the conclusive presumption embodied in
these rules,* like that in *Vlandis, is neither "necessarily [nor]
universally true," and is violative of the Due Process Clause.*
(Énfasis suplido, cita omitida y escolios omitidos.) *Cleveland
Board of Education v. LaFleur,* supra, págs. 644, 645–646.

Sobre las medidas alternativas a la clasificación, se ex-
presó que era necesario crear un mecanismo de examen
individualizado de cada maestra. Cuando el único funda-
mento para preferir el uso de la clasificación, sobre otros
medios, es la conveniencia administrativa, la clasificación
no prevalecerá y se requerirá al Estado el uso de mecanis-
mos o procesos en los que se considere a cada persona
individualmente. *Cleveland Board of Education v. La-
Fleur,* supra.

Ya hemos examinado el contenido de la doctrina de la
presunción incontrovertible y cómo ésta opera. Veamos
ahora las interrogantes y divergencias de criterio que ha
generado en cuanto a su fundamento teórico y adecuación
como análisis constitucional.

Existe controversia sobre si la doctrina de la presunción
irrefutable o incontrovertible constituye un análisis al am-
paro de la garantía del debido proceso de ley, o si, por el
contrario, ésta se fundamenta en la disposición relativa a
la igual protección de las leyes. Según vimos en *Cleveland
Board of Education v. La Fleur,* supra, el Tribunal ha ex-
presado que la doctrina se fundamenta en el debido pro-
ceso de ley. Véanse: B.L. Ackerman, *The Conclusive Pre-
sumption Shuffle,* 125 U. Pa. L. Rev. 761, 770 (1977); Nota,

*The Conclusive Presumption Doctrine: Equal Process or Due Protection?*, 72 Mich. L. Rev. 800, 816 (1974). Sin embargo, son muchos los que difieren de esta expresión.

El tratadista Lawrence H. Tribe sostiene que la presunción irrefutable constituye un análisis intermedio de la garantía de la igual protección de las leyes. L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 1618–1625. Otros describen la doctrina como una mezcla de los análisis bajo ambas garantías constitucionales, la igual protección de las leyes y el debido proceso de ley. Por esta razón se le ha denominado como un híbrido. En el pasaje que a continuación presentamos, su autor nos demuestra que los elementos de la doctrina de la presunción irrefutable se asemejan, aunque no concuerdan exactamente, con los de las disposiciones de la igual protección de las leyes y el debido proceso de ley.

Irrebuttable presumption analysis represents a hybrid, if not simply a confusion, of the scrutiny usually applied to each of these two processes. The cases involve challenges by individuals who belong to classes which have been disadvantaged by a legislative enactment. The concern of the Court is not whether the complainants do in fact belong to the group disadvantaged by the classification, but rather whether the individuals disadvantaged by the classification have been accurately grouped with respect to the statutory purpose.... *This concern with classificatory accuracy resembles the concerns of equal protection analysis.*

*However, the standard of "universal truth" applied to the cases is considerably stricter than that normally applied in equal protection analysis.* Rather than determining whether a classification bears some general connection to a statutory purpose, the Court focuses on whether the classification disadvantages any individuals who should not be disadvantaged, in light of that purpose.... *Thus, the focus seems to be more on the treatment of particular persons than on the overall accuracy of legislative classifications.*

The hearing required by the irrebuttable presumption cases also manifests this concern for the individual. *This remedy does not prevent the state from discriminating on the basis of the criteria chosen by the legislature. It only requires that the individual be allowed to challenge the discrimation.*

*This remedy appears similar to the remedy established in pro-cedual due process cases. In fact it is quite different.* In the procedual due process cases, the hearing is designed to deter-mine whether an individual belongs to the class in which he has been placed. *In the irrebuttable presumption cases, the hea-ring is designed to determine whether, in a particular instance, the treatment of an individual belonging to a legislative classi-fication is consistent with the statutory purpose.*

*This strange hybrid of due process and equal protection scru-tiny seems to be applicable to any legislative classification.* (En-fasis suplido y escolios omitidos.) Nota, *The Irrebuttable Pre-sumption Doctrine in the Supreme Court,* supra, págs. 1547–1548.

La doctrina de la presunción irrefutable ha sido dura-mente criticada por, alegadamente, ser un análisis confuso e injustificado. De igual manera se han expresado los tra-tadistas Ronald D. Rotunda y John E. Nowak en su tra-tado de Derecho Constitucional.

By m[ak]ing substantive decisions in procedural language, *the Supreme Court, in the irrebuttable presumption cases, con-fused due process and equal protection analysis.* Irrebuttable presumption analysis allowed the Court to overturn legislative decisions without having to justify the use of judicial power as would an open use of substantive due process or equal protec-tion analysis. *The use of irrebuttable presumption language was a conceptually confused, if not dishonest, method of justi-fying independent judicial review of legislative classifications.* The declining use of irrebuttable presumption analysis may evidence increasing willingness of justices to address directly the judicial role in reviewing legislative created classifications. (Énfasis suplido y escolio omitido.) 2 *Treatise on Constitutional Law: Substance and Procedure* Sec. 17.6, pág. 642 (1992). Véanse: Nota, *The Conclusive Presumption Doctrine: Equal Process or Due Protection?,* supra, págs. 827, 834; *Nota, The Irrebuttable Presumption Doctrine in the Supreme Court,* su-pra, págs. 1555, 1556.

Rotunda y Nowak sostienen que el análisis que debe usarse al examinar la constitucionalidad de clasificaciones legislativas es el de los escrutinios bajo la garantía de la igual protección de las leyes.

It now seems readily apparent that these cases actually rest

on an equal protection rationale, for the objectionable portion of each law was the way in which it classified individuals.... In none of the cases would a "process" have saved the law because the procedure would only have determined whether an individual fitted into one of these arbitrary classifications. (Escolios omitidos.) *Treatise on Constitutional Law*, suprá, pág. 640.

Estas manifestaciones implican un rechazo a la doctrina de la presunción irrefutable.

Otros estudiosos apoyarían la doctrina si se limitara su ámbito o alcance. Algunos sugieren que se reformule como parte del análisis de la igual protección de las leyes. De esta manera se convertiría en un tipo de escrutinio intermedio. Nota, *The Conclusive Presumption Doctrine: Equal Process or Due Protection?*, supra, págs. 835–836. Los autores Irving A. Gordon y Marvin A. Tenenbaum proponen que la doctrina sólo se aplique en casos en los que la característica objeto de clasificación está fuera del control del individuo y la inclusión del mismo en la clasificación sólo se justifica por conveniencia administrativa. A este nuevo enfoque le han llamado "el principio de la oportunidad individual". I.A. Gordon y M.A. Tenenbaum, *Conclusive Presumption Analysis: The Principle of Individual Opportunity*, 71 Nw. U.L. Rev. 579, 583 (1976).

Las fuentes que hemos examinado nos permiten concluir que existen serias divergencias de criterio sobre la naturaleza de la doctrina. Además, la misma ha sido criticada por presentar un análisis alegadamente incorrecto de acuerdo con los reconocidos parámetros constitucionales del debido proceso de ley y la igual protección de las leyes. Estas manifestaciones demuestran que existen serias interrogantes sobre el fundamento teórico de la doctrina, lo que ha provocado que no haya sido aceptada con beneplácito.

■ Aunque la doctrina no ha sido expresamente revocada, ha caído en desuso por el propio Tribunal Supremo de Estados Unidos. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo.

P.R., 1988, Vol. II, pág. 1264. En *Weinberger v. Salfi*, 422 U.S. 749 (1975), el Tribunal se negó a aplicar el análisis de la presunción irrefutable. Al expresarse sobre ella la consideró

> ...a virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with the Fifth and Fourteenth Amendments to the Constitution". *Weinberger v. Salfi*, supra, pág. 772.

Además, distinguió los anteriores casos decididos bajo dicha doctrina. A esos fines expresó que éstos fueron resueltos por otros fundamentos. La clasificación impugnada en *Weinberger v. Salfi*, supra, se examinó mediante el análisis de la igual protección de las leyes. Esta opinión ha sido interpretada como un rechazo a la doctrina de la presunción irrefutable. Serrano Geyls, *op. cit.*, pág. 1265; Gordon y Tenenbaum, *supra*, pág. 580; Ackerman, *supra*, pág. 771.

En *Turner v. Dept. of Employment Security*, 423 U.S. 44 (1975), el Tribunal aplicó el examen de la presunción irrefutable. Sin embargo, después de esta opinión no le ha vuelto a usar, ni siquiera en aquellos casos en los que se le ha planteado la posibilidad del remedio de vista administrativa ante la impugnación de una clasificación legislativa. *Massachusetts BD. of Retirement v. Murgia*, 427 U.S. 307 (1976). Véase, también, *Treatise on Constitutional Law*, supra, pág. 640.

■ Las diversas críticas a la doctrina de la presunción irrefutable y su virtual abandono por el Tribunal Supremo federal aconsejan que no la incorporemos en nuestro Derecho. Además, según surge del caso de *Paz Lisk v. Aponte Roque*, supra, al examinar una alegación de discrimen por razón de una norma de admisión al ejercicio de una profesión, el método de análisis que debe usarse es el de los escrutinios, según dispuesto por la garantía constitucional de la igual protección de las leyes. Por lo tanto,

procede que examinemos la disposición impugnada mediante este análisis.

## III

La apelante sostiene que el Art. 9.070(2) del Código de Seguros de Puerto Rico, *supra*, establece una clasificación que violenta la garantía de la igual protección de las leyes al distinguir entre empleados públicos y personas que no son empleados públicos. A los primeros se les prohibe trabajar como agentes de seguros, mientras que a los segundos no.

La Constitución del Estado Libre Asociado de Puerto Rico, en su Art. II, Sec. 7, L.P.R.A., Tomo 1, ed. 1982, pág. 275, dispone que no "se negará a persona alguna en Puerto Rico la igual protección de las leyes". "Esta disposición se activa cuando nos enfrentamos a una legislación o a una acción estadual que crea clasificaciones entre grupos, discriminando a unos frente a otros." *Berberena v. Echegoyen,* 128 D.P.R. 864, 878 (1991). Véase, en general, sobre el análisis de la igual protección de las leyes, *Defendini Collazo et al. v. E.L.A., Cotto*, 134 D.P.R. 28 (1993).

Esta garantía constitucional no prohíbe o impide que el Estado establezca clasificaciones para descargar adecuada y eficientemente sus funciones. *Berberena v. Echegoyen*, supra. Tampoco exige que se dé un trato igual a todas las personas. *Mercado Vega v. U.P.R.*, 128 D.P.R. 273 (1991). Lo que prohíbe es el trato desigual injustificado. *Aulet v. Depto. Servicios Sociales*, 129 D.P.R. 1 (1991); *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319, 332 (1987). Se pueden establecer diferencias en el trato si éstas tienen una justificación objetiva. *Calo Morales v. Cartagena Calo*, 129 D.P.R. 102 (1991); *Almodóvar v. Méndez Román*, 125 D.P.R. 218 (1990); *Salas v. Municipio de Moca*, 119 D.P.R. 625, 632 (1987). Por lo tanto, el Estado podrá

establecer clasificaciones siempre que éstas sean razonables y estén dirigidas a alcanzar o proteger un interés público legítimo. Ante la impugnación de una clasificación, la función judicial se limita a examinar la razonabilidad de ésta. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 277 (1975). Para ello se utilizan dos (2) criterios o escrutinios que han sido establecidos jurisprudencialmente: el escrutinio estricto o examen minucioso y el tradicional mínimo o de nexo racional.([2]) *Rodríguez v. Depto. Servicios Sociales*, 132 D.P.R. 617 (1993).

El escrutinio estricto dispone el examen más riguroso de la ley. Este se utiliza para analizar las llamadas clasificaciones sospechosas o cuando la clasificación afecta un derecho fundamental. Se consideran clasificaciones sospechosas aquellas que se establecen por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y nacionalidad. Entre los derechos fundamentales se han reconocido el derecho al voto, a la libertad de culto, a la libertad de expresión, a la vida, a la protección de ley contra ataques abusivos a la honra y el derecho a la intimidad. *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562 (1992).

Al aplicar este escrutinio se presume la inconstitucionalidad de la disposición impugnada. *Rodríguez Rodríguez v. E.L.A.*, supra. Es el Estado quien tiene el peso de la prueba para demostrar que la clasificación responde a un interés estatal apremiante y que la misma es necesaria para promover ese interés, es decir, que no existe un medio menos oneroso para adelantar o alcanzar el mismo. *Calo Morales v. Cartagena Calo*, supra.

---

([2]) En Puerto Rico no hemos adoptado el llamado *escrutinio intermedio* que se utiliza en otras jurisdicciones. Este se usa cuando la clasificación impugnada afecta "intereses individuales importantes". *León Rosario v. Torres*, 109 D.P.R. 804, 814 (1980). El análisis mediante escrutinio intermedio requiere que la clasificación adelante un legítimo interés gubernamental y que esté sustancialmente relacionada con éste. *Treatise on Constitutional Law*, supra, Vol. 3, Sec. 18.3, pág. 17.

El escrutinio de nexo racional constituye un examen deferente de la clasificación impugnada. Este se utiliza al analizar disposiciones de tipo socioeconómico. Al aplicar este escrutinio se presume la constitucionalidad de la clasificación. *Rodríguez Pagán v. Depto. Servicios Sociales*, supra. Le corresponde a quien la impugna probar que la misma es claramente arbitraria y que no puede establecerse nexo racional alguno entre ésta y un interés legítimo del Estado. *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 538 (1984). Por lo tanto, se mantendrá la constitucionalidad de la clasificación si puede razonablemente concebirse una situación de hechos que la justifique. *M. & B.S., Inc. v. Depto. de Agricultura*, supra, pág. 333.

La apelante sostiene que el escrutinio que debe utilizarse en este caso es el estricto porque la clasificación impugnada afecta un derecho fundamental. A ese fin expone que el Art. 9.070(2) del Código de Seguros de Puerto Rico, *supra*, infringe el derecho al trabajo.

La Constitución del Estado Libre Asociado en su Art. II, Sec. 16, L.P.R.A., Tomo 1, ed. 1982, pág. 327, enumera los derechos de los trabajadores, entre los que se encuentra "el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella ...". Según surge del Diario de Sesiones de la Convención Constituyente de Puerto Rico, este derecho va dirigido a garantizar que no se obligue a una persona a realizar un trabajo en contra de su voluntad. En el Informe de Comisión de la Carta de Derechos aparecen expresiones en este sentido.

La Comisión subraya la alta dignidad del esfuerzo humano y destina esta sección al señalamiento de los derechos básicos del trabajador como tal. Coloca particular énfasis en aquel grueso de la clase trabajadora que por razón de especial desvalimiento históricamente ha necesitado, aunque no siempre ha recibido, protección social.

*La primera cláusula subraya el carácter, libre y voluntario de todo trabajo. A nadie se puede imponer una tarea en contra de su voluntad; tampoco se pierde nunca el derecho a renunciar.* No

quiere decir esto que el trabajador tenga derecho constitucional a rehusar llevar a cabo parte de su labor y continuar, no obstante, detentando determinado empleo en violación de los términos de su contrato. Las condiciones de trabajo quedan normalmente convenidas de antemano en forma bilateralmente obligatoria y tendrán mayor o menor amplitud con arreglo a su particular naturaleza. (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2573–2574 (1962).

Hemos interpretado que este derecho constitucional no es de carácter absoluto y puede ser renunciado o limitado por el propio trabajador.

Al redactar nuestra Constitución, los delegados a la Convención Constituyente le dieron cardinal importancia al área del derecho del trabajo y de los trabajadores....

Esta Sección establece el derecho de todo trabajador a escoger y a renunciar libremente a la ocupación a que quiera dedicarse. *Tal derecho, a pesar de ser de rango constitucional, no es absoluto. Puede ser renunciado o limitado por el propio trabajador. Este puede, mediante la celebración de un contrato, establecer las condiciones razonables de trabajo que regirán la relación obrero-patronal.* Sin embargo, dicho contrato no puede ir contra lo establecido en las leyes protectoras del trabajo, ni ser producto de una presión u opresión indebida por parte del patrono. (Énfasis suplido.) *Dolphin Intl. of P.R. v. Ryder Truck Lines*, 127 D.P.R. 869, 877–878 (1991).

Del examen del historial legislativo y la interpretación judicial de este derecho, podemos concluir que el propósito del mismo es evitar que las personas sean obligadas a realizar un trabajo involuntariamente. Este derecho no es una garantía de que la persona podrá trabajar en cualquier empleo que seleccione, según alega la apelante. La disposición constitucional es una protección para evitar que se obligue a una persona a trabajar en contra de su voluntad.

El Art. II, Sec. 20 de la Carta de Derechos de nuestra Constitución, L.P.R.A., Tomo 1, reconocía el derecho de toda persona a obtener trabajo. Sin embargo, esta sección no fue aprobada.

El Art. II, Sec. 7 de la Constitución del Estado Libre Asociado, *supra*, reconoce el derecho a la vida como derecho fundamental del ser humano. Hemos establecido que en el mismo se encuentran subsumidos otros derechos, entre éstos, el derecho a un empleo.

> *El derecho a un empleo, esto es, a devengar ingresos y a tener una vida justa y decente, es un principio inalienable al hombre, preexistente a la más antigua de las constituciones conocidas.* El destino incierto de la frustrada Sec. 20 de nuestra Constitución, late entre aquellos derechos que aunque no se mencionan expresamente en el texto, el pueblo se reserva frente al poder político creado. Véanse: Constitución de Estados Unidos de América, Emda. Art. IX; Constitución del Estado Libre Asociado, Art. II, Sec. 19; *Ortiz Cruz v. Junta Hípica*, 101 D.P.R. 791, 794–795 (1973). 4 Diario de Sesiones, *supra*, págs. 2530–2532, 2539–2543, 2575–2577. En efecto, la Convención Constituyente tuvo muy presente expandir el alcance del concepto "vida" como derecho inalienable del hombre. Uno de sus ilustres delegados, expresó en aquella ocasión la siguiente visión:

> ...La palabra "vida" contiene toda una serie de derechos aparte del de la simple respiración, que no están incluidos necesariamente en la palabra "libertad" ni en la palabra "propiedad". O sea, de eliminarse la palabra "vida" de esta frase tan consagrada en la historia de este gran derecho, se estaría haciendo un cambio fundamental en cuanto [a eso], principalmente ahora que se está expandiendo el área de los derechos humanos y ahora que se está reconociendo una segunda carta de derechos a la anterior clásica, tipo siglo XVII, y *se están significando como derechos del hombre también en este documento, el derecho a la educación, el derecho al trabajo, el derecho a un nivel adecuado de vida.*

> *Todos estos derechos que abonan y que son necesarios para el debido desenvolvimiento de la personalidad humana están comprendidos fundamentalmente en la palabra "vida". Y es la cláusula de debido proceso de ley, ciertamente, el principal escudo histórico para su defensa.* (Énfasis suplido y en el original, y escolio omitido.) *Amy v. Adm. Deporte Hípico*, 116 D.P.R. 414, 421–422 (1985).

Según surge del pasaje citado, el derecho a un empleo está estrechamente relacionado con la garantía de

que ninguna persona será privada de su libertad o propiedad sin un debido proceso de ley. *Amy v. Adm. Deporte Hípico*, supra, pág. 422. Véase Serrano Geyls, *op. cit.*, pág. 1192. Los casos en los que se ha declarado la existencia del derecho a un empleo presentaban controversias relativas al cumplimiento con los requisitos que impone el debido proceso de ley ante una privación de empleo. *Ortiz Cruz v. Junta Hípica*, 101 D.P.R. 791, 794 (1973); *Hernández Cruz v. Sria. de Instrucción, 117 D.P.R. 606 (1986) Instrucción*; Serrano Geyls, *op. cit.*, pág. 1267. Por lo tanto, el derecho a un empleo va principalmente dirigido a garantizar que ante la privación de éste se cumpla con los requisitos del debido proceso de ley.

Similar alcance se le ha reconocido al derecho al trabajo en la Constitución federal. El tratadista Lawrence H. Tribe, *op. cit.*, págs. 1375–1378, sostiene que este derecho es de carácter procesal.

> Although we have argued ... that among the rights to bodily integrity are rights to at least minimal subsistence and that such rights give rise to affirmative governmental duties, we could not deduce from such duties a judicially cognizable remedy for every instance of unmet needs; as we saw, *government's affirmative duties must ordinarily be translated into doctrine somewhat more obliquely—through a variety of procedural, structural, and other protections designed, in their cumulative effect, to minimize the risk that someone will in fact suffer extreme deprivation. Among those protections has been a revitalized concern to prevent at least procedurally unfair exclusions from the occupation or vocation of one's choice.*
>
> [J]ust as we have seen that a claim of unmet needs does not automatically give rise to a judicially cognizable basis for insisting that government step in with specific services, so it must be the case that, even with respect to employment, not every frustrated wish creates a constitutional cause of action against the state. As Justice Douglas said in his *Barsky* dissent, '[c]ertainly a man has no affirmative right to any particular job or skill or occupation. The Bill of Rights does not say who shall be doctors or lawyers or policemen. But it does say that certain rights are protected, that certain things shall not be done. And so the question here is not what government must give, but

rather what it may not take away.' *What it may not take away without clear and focused justification is a fair opportunity for an individual to realize her identity in a chosen vocation.* (Énfasis suplido y escolio omitido.).

Por su parte, Rotunda, Nowak y Young sostienen que no existe un derecho fundamental federal a adquirir o mantener un empleo en el sector público. *Treatise on Constitutional Law*, supra, Vol. 3, págs. 29, 516–521.

El derecho a un empleo, según lo hemos reconocido, no garantiza a la persona que podrá trabajar en el empleo de su preferencia, como alega la apelante. Distinto sería el caso si lo que se intentara fuera privar a la demandante de su única fuente de ingreso. *Amy v. Adm. Deporte Hípico*, supra.

El escrutinio de nexo racional ha sido utilizado, tanto en la jurisdicción federal como en las estatales, al evaluar disposiciones relativas a limitaciones en la otorgación de licencias para poder ejercer una profesión por considerarse legislación de tipo socioeconómico. Además, en estos casos no se afectaban intereses fundamentales ni existían clasificaciones sospechosas. *Hartford Co. v. Harrison*, 301 U.S. 459 (1937); *Daniel v. Family Ins. Co.*, 336 U.S. 220 (1949); *Ferguson v. Skrupa*, 372 U.S. 726 (1963); *Hauser v. North British & Mercantile Ins. Co.*, 100 N.E. 52 (1912); *Motors Ins. Corp. v. Robinson*, 106 N.E.2d 572 (1951); *ADA Financial Service Corp. v. State*, 416 A.2d 908 (1979); *Ford Motor Co. v. Insurance Com'r of Com. of Pa.*, 672 F. Supp. 841 (E.D. Pa. 1987).

En *Paz Lisk v. Aponte Roque*, supra, al analizar la imposición del requisito de ciudadanía para obtener el certificado de maestro, utilizamos el escrutinio estricto. Ello debido a que "las clasificaciones por razón de ciudadanía son inherentemente sospechosas", y no porque se afectara derecho fundamental alguno al trabajo. Íd., pág. 488.

El Art. 9.070(2) del Código de Seguros de Puerto Rico, *supra*, no presenta clasificaciones sospechosas ni

afecta derechos fundamentales. El derecho al trabajo, en la forma en que lo invoca la apelante, no encuentra apoyo en el Art. II, Sec. 16 de nuestra Carta de Derechos, *supra*. Tampoco concuerda con las normas que hemos establecido relativas al derecho a un empleo. Por lo tanto, debido a que la legislación impugnada no afecta derecho fundamental alguno, no procede la utilización del escrutinio estricto. En su lugar utilizaremos el escrutinio de nexo racional porque la disposición en controversia es de naturaleza socio-económica.

Según hemos expuesto, el escrutinio de nexo racional dispone que la clasificación impugnada no adolecerá de vicio de inconstitucionalidad si existe algún nexo racional entre ésta y un interés legítimo del Estado. Aunque el contenido del escrutinio parece ser sencillo, su significado no es completamente claro. *Treatise on Constitutional Law*, supra, Vol. 3, pág. 22. Procede, pues, que examinemos con detenimiento el fundamento teórico de este escrutinio y las normas que se han elaborado para su aplicación.

Al utilizar el escrutinio de nexo racional, el tribunal tiene que adoptar una actitud de gran deferencia hacia la actuación legislativa que se impugna. El fundamento de esta norma de deferencia reside en el principio constitucional de separación de poderes. Debido a que las Ramas Legislativa y Ejecutiva son las llamadas a establecer e implantar la política pública del Estado, el examen judicial no se puede convertir en una evaluación independiente de la sabiduría o corrección de la legislación o actuación impugnada. Véanse: *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981); *Berberena v. Echegoyen*, supra, págs. 881–882; *Schweiker v. Wilson*, 450 U.S. 221 (1981); *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985). Aunque la clasificación no parezca ser la manera más acertada, adecuada, sabia y eficiente de adelantar el propósito legislativo, el tribunal debe mantener su constitucionalidad una vez se demuestre que existe una

relación racional entre ésta y el propósito esbozado. Por lo tanto, la intervención judicial será muy limitada. Serrano Geyls, *op. cit.*, pág. 1086.

■ Por virtud de la separación de poderes, le corresponde a las ramas políticas de gobierno, y no a la Judicatura, diseñar las clasificaciones de tipo socioeconómico.

> The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. *Vance v. Bradley*, 440 U.S. 93, 97 (1979). Véase *Schweiker v. Wilson*, supra.

El tribunal no puede adjudicarse las funciones de la Legislatura al examinar la constitucionalidad de un estatuto bajo la garantía de la igual protección de las leyes.

> [T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines ... in the local economic sphere ...." *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

■ La deferencia a la determinación legislativa se materializa a través de la presunción de constitucionalidad que acompaña a los estatutos que se evalúan mediante este escrutinio. Por ello se coloca el peso de la prueba en la parte que sostiene la inconstitucionalidad de la clasificación. *Zachry International v. Tribunal Superior*, supra, pág. 277. Para prevalecer, ésta tendrá que demostrar que no existe nexo racional alguno entre la clasificación impugnada y un interés legítimo del Estado. Íd. El tribunal sólo declarará la inconstitucionalidad de la clasificación si se le demuestra que ésta presenta un discrimen arbitrario e irracional. *Bankers Life & Casualty Co. v. Crenshaw*, 486 U.S. 71 (1988). Únicamente este tipo de discrimen constituye una violación a la garantía de la igual protección de las leyes bajo el escrutinio de nexo racional.

*Kadrmas v. Dickinson Public Schools*, 487 U.S. 450 (1988).
Existe un discrimen arbitrario o irracional cuando la diferencia que la clasificación establece entre las personas o grupos es totalmente irrelevante al propósito que se pretende alcanzar con ella.

> For it is axiomatic that the consequence of regulating by setting apart a classified group is that those in it will be subject to some restrictions or receive certain advantages that do not apply to other groups or to all the public. This selective application of a regulation is discrimination in the broad sense, but it may or may not deny equal protection of the laws. *Clearly, it might offend that constitutional safeguard if it rested on grounds wholly irrelevant to achievement of the regulation's objectives. An example would be a law applied to deny a person a right to earn a living or hold any job because of hostility to his particular race, religion, beliefs, or because of any other reason having no rational relation to the regulated activities.* (Énfasis suplido y cita omitida.) *Kotch v. Pilot, Comm'rs.*, 330 U.S. 552, 556 (1947). Véanse: *McGowan v. Maryland*, 366 U.S. 420 (1961); *Pennell v. San Jose*, 485 U.S. 1 (1988); *Gregory v. Ashcroft*, 501 U.S. 452 (1991).

Esta norma pretende evitar que subsistan clasificaciones cuyo único propósito es discriminar contra un grupo no favorecido por la Legislatura.

> [C]ourts should strike down laws under the rationality test when it is clear that there is no purpose for a classification other than denying a benefit (even if it is not a fundamental right) to a group (even a non-suspect classification) when the denial of the benefit can serve no possible purpose other than the desire to discriminate against a group which is disfavored by the legislature. *Treatise on Constitutional Law*, supra, Vol. 3, págs. 38, 39–40.

En ausencia de este puro propósito discriminatorio, el tribunal declarará la constitucionalidad de la clasificación si puede razonablemente concluir que la misma promueve algún interés legítimo del Estado. *Exxon Corp. v. Eagerton*, 462 U.S. 176 (1983); *Nordlinger v. Hahn*, 505 U.S. 1 (1992).

> [T]he general presumption of legislative validity and correctness holds that as long as the means are debatably related to a

valid health, safety, or moral concern of government—particularly where regulating employment, business, real estate, and social welfare programsthat is, one within its scope of power, the Court will recognize a rational basis. J.A. Kushner, *Government Discrimination—Equal Protection Law and Litigation*, Nueva York, Ed. Clark, Boardman y Callaghan, 1992, Cap. 4 Sec. 4.02, págs. 4-5 a 4-7.

Al hacer este examen, el tribunal no está limitado al interés que alegue el Estado. "La ley será [declarada] constitucional siempre que razonablemente pueda concebirse una situación que justifique la clasificación." (Énfasis en el original suprimido.) *Berberena v. Echegoyen*, supra, pág. 879.

 Una clasificación no será declarada inconstitucional por ser imperfecta. *Vance v. Bradley*, supra. El Estado puede válidamente decidir atacar sólo una parte de un problema a través de la clasificación. *Williamson v. Lee Optical Co.*, 348 U.S. 483 (1955). Tampoco constituye un vicio de inconstitucionalidad el que exista una estrategia o alternativa menos onerosa que la clasificación impugnada. Kushner, *op. cit.*, Sec. 4.03(1), págs. 4-99 a 4-100. A la luz de esta normativa nos corresponde aplicar el escrutinio de nexo racional a la clasificación que la apelante impugna.

## IV

El Art. 9.070(2) del Código de Seguros de Puerto Rico, *supra*, dispone, en su parte pertinente:

Para la protección del pueblo de Puerto Rico, el Comisionado no expedirá, renovará ni permitirá que subsista ninguna licencia de agente, agente general, corredor, solicitador o ajustador, excepto en cumplimiento con este Capítulo, o con respecto a:

. . . . . . . .

(2)Cualquier persona que fuere funcionario o empleado del Gobierno de Estados Unidos, o del Estado Libre Asociado de Puerto Rico, o de cualquiera de sus dependencias, o de un municipio, escuela pública o *colegio público*, u otra subdivisión política. (Énfasis suplido.)

A base de la norma de autolimitación que dispone que el Tribunal "no formulará una regla de derechos [sic] constitucional más amplia que la que requieran los hechos precisos a los cuales ha de aplicarse," limitaremos nuestro examen a la prohibición a los empleados o funcionarios de colegio público. *E.L.A. v. Aguayo*, 80 D.P.R. 552, 596 (1958); *Rosa v. Tribunal Superior*, 102 D.P.R. 670, 678 (1974). Véase *Treatise on Constitutional Law*, supra, Vol. 4, pág. 651. Esta prudencial regla de autolimitación evita que hagamos determinaciones constitucionales innecesariamente amplias. *Cleburne v. Cleburne Living Center, Inc.*, supra.

Los hechos de este caso nos presentan a una empleada del Gobierno de Puerto Rico quien se desempeña como profesora de la Universidad de Puerto Rico, a la que, por imperativo del antes mencionado artículo, se le deniega una solicitud de agente de seguros. La disposición específica que suscitó el rechazo de su solicitud es aquella referente a empleados o funcionarios de colegio público. Por lo tanto, limitaremos nuestro análisis a esta prohibición en particular.

La clasificación que analizaremos distingue entre empleados de colegio público y personas que no son empleados públicos. A los primeros se les prohíbe ser agentes de seguros, mientras que a los segundos no. Para el análisis, según ya hemos determinado, utilizaremos el escrutinio de nexo racional. Procede, pues, que precisemos cuál es la intención o el propósito que la Legislatura pretende adelantar a través de la clasificación impugnada para entonces determinar si es un interés legítimo del Estado. *M. & B.S., Inc. v. Depto. de Agricultura*, supra, pág. 333; *Salas v. Municipio de Moca*, supra, pág. 632. A esos efectos, examinaremos el historial legislativo del Art. 9.070(2) del Código de Seguros de Puerto Rico, *supra*.

Este artículo del Código de Seguros de Puerto Rico no aparece en la primera legislación que se aprobó en Puerto

Rico relativa al negocio de los seguros, Ley Núm. 66 de 16 de julio de 1921, Leyes de Puerto Rico 523. En dicha ley se dispuso para la preparación de un reglamento por la Superintendencia de Seguros. Sec. 6(d) de la Ley Núm. 66, *supra*, 1921 Leyes de Puerto Rico 531. El Reglamento Núm. 1 de la Superintendencia de Seguros se aprobó el 17 de febrero de 1938. Es en éste que aparece, por primera vez, una disposición similar al Art. 9.070(2) del Código de Seguros de Puerto Rico, *supra*. La Regla XIII del mismo disponía que:

> [n]o se expedirán nuevos certificados de autorización a empleados del gobierno federal, gobierno insular, gobierno municipal o instituciones bancarias. Reglamento Núm. 1 de la Superintendencia de Seguros, Regla XIII, Apéndice a la Ley de Seguros de Puerto Rico, San Juan, Negociado de Materiales, Imprenta y Transporte, 1939, pág. 115.

El Secretario de Justicia, en Opinión de 27 de abril de 1950, se expresó sobre el propósito de esta disposición.

> El propósito de esta regla es prohibir a determinadas personas dedicarse al negocio de seguros en Puerto Rico por estar en una posición de ventaja sobre las no incluídas en la prohibición para gestionar tales negocios. Op. Sec. Just. Núm. 1950, pág. 2.

En la década de 1950 se comenzaron una serie de gestiones dirigidas a obtener la aprobación de una nueva ley del Código de Seguros. A estos fines, en 1954, se radicó en la Legislatura el P. de la C. 1174. Este proyecto contenía un artículo titulado *Requisitos Generales para Licencia*. Este recogía la prohibición de la Regla XIII del Reglamento Núm. 1, *supra*, referente a los empleados gubernamentales y ampliaba su ámbito.

> Para la protección del pueblo de Puerto Rico, el Comisionado no expedirá, renovará ni permitirá que subsista ninguna licencia... con respecto a:
>
> (2)Cualquier individuo que sea empleado del Gobierno de los Estados Unidos, o del Gobierno del Estado Libre Asociado de

Puerto Rico o *de cualquiera de sus instrumentalidades, o de algún municipio, escuela pública o colegio público, u otra sub-división política.* (Énfasis suplido.)

Este es el primer documento en el que aparece la prohibición de que los empleados de colegios públicos no pueden ser agentes de seguros.

Las Comisiones de Hacienda y de lo Jurídico de la Cámara de Representantes celebraron vistas públicas con relación al proyecto los días 13, 15 y 17 de diciembre de 1954. En ellas no se hizo declaración alguna referente al artículo que estamos examinando. Transcripción de las vistas públicas celebradas por las Comisiones de Hacienda y de lo Jurídico de la Cámara de Representantes con relación al P. de la C. 1174 (1954).

El 27 de enero de 1955 compareció ante la Comisión de Hacienda de la Cámara de Representantes el Lcdo. Robert D. Williams, autor del anteproyecto del Código de Seguros. Este declaró que los requisitos que se imponían a la obtención de licencias iban dirigidos a garantizar que sus tenedores fueran personas con conocimiento del negocio de seguros y conscientes de sus responsabilidades para con los clientes. Al describir el contenido de los artículos sobre licencias, expresó:

It provides for the licensing of everyone who is engaged in the insurance business substantially, of agents, of brokers; of adjusters for the first time. We had not had licensing of adjusters heretofore, but it does provide for the licensing of adjusters; also licensing of solicitors. Everyone who may be operating, in an independent capacity in the insurance business, is brought under the supervision of the Commisioner and of the law through the licensing provisions. It also provides for the licensing of general agents, among others. *It also provides for the qualifications of each of those categories of licensees, so that there is some assurance that people who deal in insurance in Puerto Rico will have some knowledge of what they are doing, and will have an understanding of their responsibilities to the policyholder under the law.* (Énfasis suplido.) Comparecencia y exposición del Sr. Robert D. Williams ante la Comisión de Ha-

cienda de la Cámara de Representantes de Puerto Rico en reunión celebrada el 27 de enero de 1955, pág. 10.

El entonces Superintendente de Seguros, Sr. Mariano Nieves Hidalgo, en su informe sobre el proyecto de ley declaró que las disposiciones sobre licencias son de gran interés público. Informe sobre el Proyecto de Ley para decretar un Código de Seguros para Puerto Rico, Oficina del Superintendente de Seguros, 1956, pág. 22.

> No se expedirá licencia a ninguna persona que no se considere digna de confianza o competente. *De acuerdo con una norma establecida hace tiempo en Puerto Rico, ninguna licencia será expedida a empleados del gobierno* o a bancos u otras instituciones que conceden préstamos o sus empleados, afiliados, o subsidiarias. (Énfasis suplido.) Informe sobre el Proyecto de Ley para decretar un Código de Seguros para Puerto Rico, *supra*, pág. 23.

Con estas expresiones el Superintendente acogió y recomendó la susodicha prohibición sin exponer las razones o deseabilidad de la misma.

Como resultado del proceso legislativo, el propuesto Art. 9.070(2) fue enmendado por recomendación del Secretario de Justicia. La enmienda consistió en la eliminación de la palabra "sea" y su sustitución por la frase "fuere funcionario o no". Su propósito fue "[hacer] claro que la disposición es aplicable tanto a funcionarios como a empleados". Informe Conjunto de las Comisiones de Hacienda y de lo Jurídico de la Cámara de Representantes sobre el P. de la C. 1174, 8 Diario de Sesiones de la Asamblea Legislativa, T. II, pág. 781 (1956). Las comisiones recomendaron la aprobación de un Proyecto Sustitutivo del P. de la C. 1174 que recogía ésta y otras enmiendas. En abril de 1956 éste fue aprobado por la Cámara de Representantes. El Senado no tomó acción sobre el proyecto.

En 1957 se radicó en la Legislatura el P. de la C. 85. Este presentaba el mismo texto del P. de la C. 1174 y, por ende, la prohibición del Art. 9.070(2). En el Informe Con-

junto de las Comisiones de Hacienda y de lo Jurídico de la Cámara de Representantes sobre el P. de la C. 85 se hicieron expresiones relativas al propósito de este nuevo Código de Seguros. Se expresó que a través del mismo se buscaba "que los asegurados estén mejor protejidos, que la industria pueda desarrollarse con mayor facilidad, que la superintendencia pública pued[a] ejercerse con mayor eficiencia y que se ofrezcan oportunidades más francas al desarrollo económico y social del país". Informe Conjunto de las Comisiones de Hacienda y de lo Jurídico de la Cámara de Representantes sobre el P. de la C. 85, 9 Diario de Sesiones de la Asamblea Legislativa, T. 2, pág. 561 (1957). Este propósito se reitera en el Informe del Subcomité sobre Código de Seguros del Senado, 9 Diario de Sesiones de la Asamblea Legislativa, T. 3, pág. 1419 (1957). El P. de la C. 85, aprobado por ambos cuerpos legislativos, se convirtió en la Ley Núm. 77 de 19 de junio de 1957, Leyes de Puerto Rico, pág. 183. Esta ley proveyó un nuevo Código de Seguros para el país.

En el historial legislativo no aparece declaración alguna referente a la razón o propósito que animó a la Legislatura al aprobar la prohibición dispuesta por el Art. 9.070(2), *supra* . Esta ausencia de expresión legislativa no es obstáculo al análisis del escrutinio de nexo racional. El Tribunal Supremo federal se ha expresado sobre el particular:

> ...the Equal Protection Clause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification. United States Railroad Retirement Bd. v. Fritz, 449 US, at 179, 66 L Ed 2d 368, 101 SCt. 453. See also *McDonald* v *Board of Election Comm'rs of Chicago*, 394 US 802, 809, 22 L Ed 2d 739, 89 SCt. 1404 (1969) (legitimate state purpose may be acertained even when the legislative or administrative history is silent). *Nordlinger v. Hahn*, supra, pág. 16.

El tribunal de instancia suplió esta omisión legislativa al concluir que el propósito del artículo "fue evitar que

exista ventaja indebida y/o una relación o acceso prefe-rente a favor de los empleados públicos que fueran posee-dores de licencia de agente o corredor de seguros, en detri-mento de otros tenedores de licencia que no tienen la accesibilidad al público y la relación con ese público que tienen los empleados públicos". A esos efectos citó declara-ciones del Secretario de Justicia en las que se analiza el propósito del artículo en cuestión.

> Como la norma de protección pública que fija el Código de Seguros como uno de sus principales objetivos incluye la salva-guardia de que *todos los que se dediquen al negocio de seguros tendrán iguales ventajas y oportunidades*, debe darse pleno vi-gor a aquellas restricciones que se imponen precisamente para garantizar esa protección, en casos en que, como el presente, *los peticionarios de licencia estarían según hemos visto, en condi-ciones sumamente ventajosas para gestionar seguros, por su condición de empleado público* y de empleado de un banco, respectivamente. (Énfasis suplido.) XLVI (Núms. 1975–15) Op. Sec. Just. Núm. 53 (1980). Véase, además, Op. Sec. Just. de 24 de agosto de 1982, págs. 2–3.

Aunque, como señalamos, en el historial legislativo no hay expresiones precisas sobre la intención legislativa del Art. 9.070(2), *supra*, sí aparecen manifestaciones generales sobre la regulación de la competencia en el negocio de seguros. En este sentido se expresó que "el Código provee el grado de reglamentación necesario para la protección del público sin destru[i]r las ventajas de un sistema de libre empresa y competencia leal". Informe del Subcomité sobre Código de Seguros del Senado, IX Diario de Sesiones de la Asamblea Legislativa, T. 3, pág. 1428 (1957). De estas ma-nifestaciones se desprende que uno de los objetivos de la legislación es que exista competencia leal en el negocio de seguros, fomentando así la libre competencia en beneficio de los consumidores. Sin embargo, es importante señalar que estas declaraciones se fundamentan en un análisis teó-rico del proyecto de ley y no en un estudio sobre el funcio-namiento de la industria de seguros en Puerto Rico.

> En el estudio del proyecto de código de seguro, el Comité se ha limitado estrictamente a considerar la ley fundamental que rige el negocio de seguros en Puerto Rico y que está contenido en todos y cada uno de los artículos del proyecto ante nuestra consideración. *El Subcomité no ha hecho estudios de la forma en que funciona en la práctica, el negocio de seguros en Puerto Rico.* (Énfasis suplido.)

 Mantener la competencia leal en el negocio de seguros, fomentando así la libre competencia, es indudablemente un interés legítimo del Estado. Según señalamos anteriormente, la industria de seguros está revestida de substancial interés público. El Estado, a través de la reglamentación dirigida a promover la competencia leal, pretende erradicar prácticas desleales que afectan el equilibrio de la economía de libre mercado. 1 *Callmann on Unfair Comp. Trademarks and Monopolies* Sec. 3.03 (1992). Estas prácticas tienen un impacto negativo sobre el precio y la accesibilidad de los servicios al público. Por lo tanto, la reglamentación dirigida a mantener la competencia leal constituye una protección al consumidor.

 Permitir que los empleados de colegio público trabajen como agentes de seguros puede crear la apariencia de que el Estado favorece o endosa a aquellas compañías que tienen entre sus agentes a estos empleados. Esto podría ocasionar que los consumidores decidan hacer negocio con una compañía a base de esta apariencia, lo que resultaría en una ventaja para las compañías que recluten como agentes a empleados de colegios públicos. De esta manera se menoscabaría el propósito legislativo de mantener la competencia leal en la industria de seguros.

Además, el efecto negativo de esta apariencia de endoso gubernamental se acrecenta debido a que los colegios públicos constituyen una vasta fuente de potenciales clientes para un agente de seguros. Los colegios públicos tienen una numerosa población integrada, principalmente, por estudiantes, profesores y empleados. La comunidad en general entra a formar parte de esta población al participar de

los servicios y las actividades que estos ofrecen (*e.g.* estación de correo, espectáculos, facilidades y programas deportivos, cursos de educación continuada, etc.). Debido a la gran cantidad de público que converge en ellos, un empleado o funcionario, que sea además agente de seguros, tiene a su alcance un amplio universo de personas cuya decisión de compra de un seguro podría estar influenciada por la antedicha apariencia.

En el caso de personas que no son empleados públicos no existe la posibilidad de que surja esta apariencia de favoritismo gubernamental. Esta diferencia justifica la clasificación. Además, demuestra que existe nexo racional entre el interés del Estado en mantener la competencia leal en el negocio de seguros y prohibirle a los empleados de colegios públicos que trabajen como agentes de seguros.[3]

A pesar de que pueden existir maneras más eficientes y adecuadas, que la seleccionada por la Legislatura, para adelantar el interés de mantener la competencia leal en el negocio de seguros, ello no provoca ineludiblemente una declaración de inconstitucionalidad de la ley. Al utilizar el escrutinio de nexo racional estamos obligados a mantener la constitucionalidad de la disposición en controversia "si existe un *mero* nexo racional entre el propósito legislativo y la clasificación establecida". (Énfasis suplido.) *Berberena v. Echegoyen*, supra, pág. 879. No nos corresponde sustituir nuestros criterios en cuanto a cuál debe ser la manera más acertada de adelantar el propósito legislativo. En nuestro sistema de gobierno le corresponde a la Legislatura y al Ejecutivo, y no a la Rama Judicial, diseñar e implantar las clasificaciones socioeconómicas. En presencia del antedicho

---

[3] Prohibirle a los empleados de colegios públicos trabajar como agentes de seguros también puede promover el interés estatal en mantener una ética de excelencia en el desempeño de las labores gubernamentales. Véase Exposición de Motivos de la Ley de Ética Gubernamental, Ley Núm. 12 de 24 de julio de 1985, Leyes de Puerto Rico 709.

nexo racional, sólo éstas dos (2) ramas pueden variar el contenido de la clasificación impugnada. La Constitución no faculta a la Judicatura para ello.

Por lo tanto, resolvemos que la clasificación relativa a los empleados de colegios públicos, según dispuesta por el Art. 9.070(2) del Código de Seguros de Puerto Rico, *supra*, satisface el escrutinio de nexo racional. No hay vicio de inconstitucionalidad en ella. Procede, por lo tanto, que sostengamos su constitucionalidad.

Por los motivos antes expuestos, *se dictará sentencia confirmando la dictada por el tribunal de instancia.*

Los Jueces Asociados Señores Hernández Denton y Fuster Berlingeri concurrieron sin opinión escrita. El Juez Asociado Señor Negrón García se inhibió.