La Juez Asociada Señora Rodríguez Rodríguez
emitió la opi-nión del Tribunal.
Nos corresponde determinar si es válida una cláusula de reembolso por estudios o adiestramiento contenida en un contrato de empleo suscrito entre Oriental Financial Services Corp. y el Sr. José Juan Nieves.
I
El Sr. José Juan Nieves posee un bachillerato en admi-nistración de empresas que obtuvo en 1992. En agosto de 1996 comenzó a trabajar como oficial de plataforma en Oriental Bank & Trust, la subsidiaria bancaria de Oriental Financial Group. En tal capacidad, éste tenía a su cargo ofrecer a los clientes del banco diferentes productos banca-rios, tales como: cuentas de cheques, de ahorro, IRA’s, prés-tamos personales, etc.
En algún momento mientras trabajaba para Oriental Bank & Trust, el señor Nieves le indicó al Sr. José Rafael Fernández, quien en ese momento era vicepresidente sé-nior de Oriental Financial Services Corp. (Oriental Financial), subsidiaria de corretaje de Oriental Financial Group, que le interesaba desempeñarse como corredor de inversio-nes en Oriental Financial. Semanas después, Nieves reci-bió una llamada para que comenzara a laborar en Oriental Financial.
Como el señor Nieves no tenía experiencia en esta in-dustria, así como tampoco poseía una licencia de corredor de inversiones, Oriental Financial le ofreció sufragar los costes de adiestramiento y de obtención de la licencia. En-tre los gastos se incluyó un seminario preparatorio ofrecido en Estados Unidos. Además, durante el periodo de seis me-ses en que el señor Nieves estudiaba para su examen, Oriental Financial le pagó mensualmente la suma de *467 $1,500 para atender sus necesidades financieras inmediatas. Una vez Nieves aprobó el examen, Oriental Financial llevó a cabo todos los trámites administrativos para la obtención y el registro de la licencia de Nieves.
En el contrato de empleo suscrito entre las partes se pactó que el costo del referido adiestramiento y obtención de licencia ascendía a la cantidad de $60,000. La cláusula 6.5 del contrato proveía un mecanismo de reembolso, a pro-rrata, de estos costes en la eventualidad de que Nieves renunciara a su trabajo antes de haber cumplido cuatro años en la empresa. A esos efectos, de renunciar dentro del primer año, Nieves debía reembolsar la suma de $60,000; el segundo año reembolsaría $45,000; el tercer año reem-bolsaría $30,000 y, finalmente, si renunciaba en el cuarto año debería reembolsar la suma de $15,000. Este contrato se suscribió el 17 de septiembre de 1997.
Así las cosas, el 8 de septiembre de 2000, el Sr. Nieves renunció a Oriental Financial luego de haber recibido una oferta de empleo como corredor de inversiones en otra ins-titución financiera. El 20 de septiembre de 2000, Oriental Financial demandó al señor Nieves, a su esposa y a la So-ciedad Legal de Gananciales, reclamándoles la suma de $30,000 en virtud del contrato suscrito entre ambos.(1) Luego de varios trámites procesales, la vista en su fondo se celebró el 22 de julio de 2003. Poco después, el Tribunal de Primera Instancia dictó sentencia en el caso declarando “con lugar” la demanda instada. En una extensa sentencia, el foro primario concluyó que el contrato suscrito entre las partes era válido y que el señor Nieves tenía que cumplir las obligaciones contraídas en éste.
Inconforme, Nieves acudió ante el Tribunal de Apelaciones. El foro intermedio revocó al tribunal inferior. *468 Concluyó, en lo pertinente a la controversia que nos ocupa, que la cláusula en cuestión era una cláusula de permanen-cia en el empleo, la cual era irrazonable por ser su término excesivamente largo y por constituir un abuso del principio de la buena fe contractual, por lo cual la declaró nula. Sos-tuvo, tomando como modelo cierta legislación española, que la duración máxima del pacto de permanencia debía ser de dos años.
Inconforme, Oriental Financial acudió ante nosotros mediante una petición de certiorari. En su recurso, Oriental Financial planteó, en síntesis, que el Tribunal de Ape-laciones invocó erróneamente la doctrina española sobre los acuerdos de permanencia en el empleo entre el em-pleado y la empresa. Sostuvo que la cláusula objetada no constituía un pacto de permanencia según éste aparece re-gulado en la legislación española, sino más bien una cláu-sula de reembolso, la cual permite que la empresa recupere los costes en que incurrió en el adiestramiento ofrecido a Nieves. Finalmente, indicó que la cláusula en cuestión no prohibía que Nieves renunciara a su trabajo en cualquier momento y solamente le obligaba al reembolso de lo inver-tido en su adiestramiento.
Nieves, por su parte, adujo que el contrato suscrito en-tre él y Oriental Financial fue un contrato de adhesión que restringía su libertad de empleo al imponerle, alegó, como condición de empleo aceptar la cláusula de reembolso. Adujo que esta exigencia era contraria al principio de la buena fe contractual, por lo que el contrato de empleo era nulo.
Planteada la controversia bajo estos términos, el 31 de marzo de 2006 expedimos el auto solicitado. Con el benefi-cio de la comparecencia de las partes, pasamos a resolver el caso.
*469 II
La controversia que hoy nos ocupa pone de manifiesto el cambio de paradigma acaecido en años recientes en la re-lación laboral entre patrono y empleado. En el mundo eco-nómico contemporáneo, la información y el conocimiento se han transformado en las principales armas de la competitividad. El desarrollo económico actual obliga a las empresas más competitivas a gestionar su conocimiento como un activo clave para mantener y acrecentar su com-petitividad; es decir, el conocimiento representa un activo de capital.(2) De ahí el interés legítimo de éstas de proteger su información confidencial, sus clientes, sus empleados claves, etc. Esto es particularmente cierto para las indus-trias de alta tecnología o para aquellas basadas en el conocimiento.(3)
Igualmente, las empresas modernas tienen que invertir en la formación y el desarrollo profesional de sus empleados si desean mantenerse en una posición ventajosa frente a sus competidores.(4) Así pues, la inversión en la *470 formación constituye una variable estratégica que le pro-porciona a las empresas las mejores oportunidades de competitividad. Por tal razón, entre otras, la entidad co-mercial interesa recuperar su inversión.
Las cláusulas o los contratos de no competencia, de exclusividad y de reembolso por adiestramiento o educación, están diseñadas para, precisamente, proteger y adelantar estos intereses comerciales. Persiguen el objetivo de capitalizar, a través del mejor método posible, el potencial humano de las empresas. Todas ellas, en alguna medida, imponen limitaciones a la movilidad del trabajador y, como tal, generan tensiones entre los intereses de la empresa y del empleado.(5)
En esta ocasión se nos plantea por primera vez si una cláusula de reembolso por educación o adiestramiento es válida y, por lo tanto, exigible la obligación de reembolso contraída.
III
En nuestra jurisdicción, como sabemos, rige el principio de libertad de contratación. El Art. 1207 del Có- *471 digo Civil, 31 L.P.R.A. sec. 3372, reconoce el principio de autonomía contractual de las partes al disponer que los contratantes pueden establecer los pactos, las cláusulas y las condiciones que tengan por convenientes, siempre que no sean contrarios a las leyes, a la moral y al orden público. De igual forma, el Art. 1044 del Código Civil, 31 L.RR.A. see. 2994, establece el principio general de que las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse a su tenor. Por su parte, los tribunales están facultados para velar por el cumplimiento de los contratos y no deben rele-var a una parte del cumplimiento de su obligación contractual cuando dicho contrato sea legal, válido y no contenga vicio alguno. Mercado Quilichini v. U.C.P.R., 143 D.P.R. 610 (1997).
La buena fe es un principio medular en nuestro derecho de contratos. Sus dictámenes vinculan a las partes durante las relaciones precontractuales, afectan la interpretación de los contratos, regulan su cumplimiento y permiten su modificación.(6) Véase J.L. De los Mozos, El principio de la buena fe: Sus aplicaciones prácticas en el Derecho Civil español, Barcelona, Ed. Bosch, 1965, págs. 179-183 y 222-228; J. Mosset Iturraspe, Interpretación Económica de los Contratos, Buenos Aires, Rubiznol-Culzoni Editores, 1994, Cap. IV. Es una fuente que produce *472 “ ‘especiales deberes de conducta exigióles en cada caso, de acuerdo con la naturaleza de la relación jurídica y con la finalidad perseguida por las partes a través de ella’ ”. Arthur Young & Co. v. Vega III, 136 D.P.R. 157, 170 (1994), citando a M. Godreau Robles, Lealtad y Buena Fe Contractual, LVIII (Núm. 3) Rev. Jur. U.P.R. 367, 379 (1989), donde se cita a L. Diez-Picazo, Prólogo, en Wieacker, El principio general de la buena fe, Madrid, Ed. Civitas, 1982, pág. 19.
La buena fe, como principio general del Derecho, constituye una norma jurídica que se traduce en la obligatoriedad para todos los miembros de la comunidad jurídica de actuar de buena fe en sus relaciones recíprocas. “Trasladada esta idea al ámbito contractual, significa que los sujetos deben comportarse lealmente en sus relaciones jurídicas, o, dicho de otra manera, que deben ejercitar de buena fe los derechos cuya titularidad les pertenece, así como cumplir, también de buena fe, las obligaciones que les competen.” N. Sirvent Hernández, El pacto de permanencia en la empresa, Valencia, Ed. Tirant lo Blanch, 2002, pág. 101. El contrato de trabajo evidentemente no está exento de cumplir con este precepto. “[L]a buena fe, ‘en sus diversos aspectos y manifestaciones, tiene suma importancia en estas relaciones humanas derivadas del contrato de trabajo’.” J. García Viña, La buena fe en el contrato de trabajo, Madrid, Consejo Económico y Social, 2001, pág. 27, citando a J. Menéndez Pidal, La lealtad en el contrato de trabajo, 210 Rev. Gen. Leg. Jur. 646 (1961).
Por otra parte, en Puerto Rico, el derecho de un trabajador a seleccionar y a renunciar a su trabajo goza de una alta estima entre los valores tutelados por nuestra Constitución. Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1. Véanse: San Miguel Lorenzana v. E.L.A., 134 D.P.R. 405, 426-427 (1993); Dolphin Int’l of P.R. v. Ryder Truck Lines, 127 D.P.R. 869, 878 (1991). Existe una clara política pú- *473 blica a favor del derecho de toda persona a obtener empleo, devengar ingresos y renunciar a ese empleo en cualquier momento para dedicarse a otra ocupación. No obstante, he-mos reconocido que éste no es un derecho absoluto y, como tal, “[p]uede ser renunciado o limitado por el propio trabajador. Este puede, mediante la celebración de un con-trato, establecer las condiciones razonables de trabajo que regirán la relación obrero-patronal”. Dolphin Int’l of P.R. v. Ryder Truck Lines, supra, pág. 878.
En el pasado, hemos utilizado los principios antes enunciados al considerar la validez de distintas cláusulas o acuerdos contractuales que, como habíamos señalado, imponen limitaciones al derecho del trabajador a renunciar o a escoger libremente su empleo. Así, en García v. World Wide Entmt. Co., 132 D.P.R. 378 (1992), reconocimos —sin mayor expresión— la validez de un acuerdo de exclusividad que impedía a un artista trabajar para terceras personas. En Arthur Young & Co., nos expresamos acerca de la validez de las cláusulas de no competencia. (7) Allí resolvimos que, como regla general, los acuerdos de no competencia son válidos sujeto a la regla de razonabilidad, según la cual un contrato de no competencia será razonable si protege intereses legítimos del patrono sin imponer una carga excesiva al empleado y sin perjudicar al público en general. En el contrato impugnado en Arthur Young & Co., concluimos que éste era nulo ya que el término de duración de la prohibición de competir (dos años) imponía una carga excesiva al empleado. Consideramos que un término razonable hubiese sido el de un año.
Con ello en mente, evaluemos detenidamente la cláu-sula de reembolso impugnada en este caso.
*474 IV
La cláusula de reembolso es aquella mediante la cual el empleado se compromete a repagar al patrono los costes en que este último incurrió en su adiestramiento o educación, si el empleado finaliza su relación de empleo antes de que el patrono haya podido recuperar su inversión mediante el rendimiento del empleado.(8) Su finalidad es, por lo tanto, garantizar a la empresa la amortización de los gastos que para ella ha supuesto la inversión económica efectuada en la especialización del trabajador. De ordinario, previo a la firma del contrato de empleo, se le adscribe un valor económico a de adiestramiento o educación y se determina, además, el período de tiempo necesario para que el patrono pueda recuperar lo invertido. Mediante una escala descendiente, o a prorrata, se determina cómo se reduce lo adeudado a mediada que el empleado va rindiendo beneficios a la empresa. Este mecanismo o fórmula ha sido descrito bajo los términos siguientes:
Training cost repayment agreements usually require employees to work for a period of one to several years to avoid being charged for their training. Typically, they contain a repayment obligation that decreases in proportion to the employee’s post-training service. Employees are credited with *475 partial repayment in kind for each successive period that they remain on the job until the entire amount is discharged. A.W. Kraus, Repayment Agreements for Employee Training Costs, 44 (Núm. 1) Labor L.J. 49, 49-50 (1993).
Este no es un cálculo que se hace al azar, sino que res-ponde a un análisis de costo-beneficio que le permite a la empresa determinar el potencial de ganancias que gene-rará su inversión, la cual ha sido previamente cuantificada. El objetivo es determinar cuál es el rendi-miento que generará la inversión en el adiestramiento del empleado y cuándo comenzará a generar las ganancias, de suerte que se pueda determinar, con algún grado de cer-teza, cuándo se recupera la inversión.(9)
Cada vez más se observa la incorporación de cláusulas de esta naturaleza a los contratos de empleo, muy en particular como alternativa a las cláusulas de no competencia. En tal rigor, se apunta:
Repayment agreements, which require employees to pay back training expenses if they quit before the employer recoups its investment, have become increasingly prevalent in employment contracts. ... [They] help employers establish proportionality between their outlay in training and their restrictions on employees, making them a formidable alternative to traditional noncompetes. (Escolios omitidos.) B.S. Long, Protecting Employer Investment in Training: Noncompetes v. Repayment Agreements, 54 (Núm. 5) Duke L.J. 1295, 1317 *476 (2005). En igual sentido, véase K.V.W. Stone, Knowledge at Work: Disputes over Ownership of Human Capital in the Changing Workplace, 34 (Núm. 3) Conn. L. Rev. 721 (2002).
Al igual que el contrato de no competencia, este tipo de cláusula será válida en la medida que proteja intereses legítimos del patrono sin imponer cargas, en exceso onerosas, sobre el derecho del empleado a escoger y renunciar libremente a su empleo. Somos del criterio que, en tanto y en cuanto el patrono haya ofrecido un adiestramiento o educación especializada o extraordinaria al empleado, supliendo de esta forma su desconocimiento o falta de experiencia en la industria o negocio en que se va desempeñar, el patrono tiene un interés legítimo en pactar contractualmente para el reembolso de los costes.(10)
El adiestramiento ofrecido no tan sólo tiene que ser de carácter especializado —es decir, no del proceso de apren-dizaje ordinario que ocurre simultáneamente al ejercicio de cualquier oficio y profesión— sino que también tiene que conllevar una inversión económica considerable por parte del patrono. Precisamente por ello es razonable el interés del patrono de proteger o recuperar su inversión, incorpo-rando cláusulas de reembolso a los contratos de empleo.
Al reconocerle validez a este tipo de cláusula, evitamos que el patrono sufra un doble daño. Por un lado, el patrono tendrá que incurrir en nuevos gastos para adiestrar su nuevo personal sin haber podido recuperar su inversión original. Además, será su competidor quien habrá de capitalizar de la inversión hecha en el adiestramiento, al reclutar a una persona a quien se le han trasferido los *477 conocimientos especializados sin haber invertido en ello.(11) Véase Cavico, Extraordinary Specialized Training as a Legitimate Business Interest in Restrictive Covenant Employment Law: Florida and National Perspectives, 14 St. Thomas L. Rev. 53 (2001).
Adviértase que el empleado también recibe un beneficio al enriquecer su patrimonio personal y profesional, por lo que pasará a ser más valorado en el mercado de empleo. Véase R.S. Arnow-Richman, Bargaining for Loyalty in the Information Age: A Reconsideration of the Role of Substantive Fairness in Enforcing Employees Noncompetes, 80 (Núm. 4) Or. L. Rev. 1163, 1204 (2001) (“training creates human capital that the employee may be inclined to sell to competitors for a profit”). Parece razonable entonces concluir que el principio de la buena fe haría que pueda esperarse de un trabajador que ha de recibir esa especialización con cargo a su empresa que, sin anular su libertad para escoger su profesión, pueda pactar una cláusula de reembolso, la cual le permita al patrono beneficiarse de su inversión; una vez pactada, que cumpla con la obligación contraída.
Estas cláusulas serán válidas en la medida en que el monto del reembolso guarde relación con los costes en que incurrió verdaderamente el patrono. Véase Kraus, supra, pág. 52 (“the amount of any repayment for the cost of training should be commensurate with its actual original cost to the employer”); Stone, supra, pág. 755. Igualmente, el término pactado para el reembolso debe ser mo- *478 derado y debe existir una correlación entre ese término y los costes del adiestramiento. Kraus, supra, pág. 52 (“the amount of any repayment for the cost of training should be commensurate with its actual original cost to the employer. The duration of the obligation to remain with that employer should also be moderate and reasonably correlated to the cost of the training”). Ya que este tipo de cláusula impone limitaciones a la libre movilidad del em-pleado, éstas deberán estipularse ateniéndose rigurosa-mente a los criterios antes mencionados, de lo contrario no serán válidas.
El acuerdo de reembolso, como todo contrato, deberá contar con los elementos esenciales para su validez: consentimiento, objeto y causa. Art. 1213 del Código Civil, 31 L.P.R.A. see. 3391. Al evaluarlos, velaremos celosamente por que el empleado haya firmado libre y voluntariamente tal acuerdo. Y al igual que indicamos respecto al contrato de no competencia, “[n]o permitiremos coacción o presión indebida alguna por parte del patrono”. Arthur Young & Co. v. Vega III, supra, pág. 176. Finalmente, este contrato ha de constar por escrito. Id.
Recapitulando, las cláusulas de reembolso son válidas en la medida en que éstas pretendan recuperar los costos reales —directos e indirectos— en que incurrió el patrono en el adiestramiento o la educación especializada ofrecida al empleado, quien carece de tal conocimiento o de experiencia. La inversión del patrono ha de ser considerable, determinación que se hará caso a caso. Además, el tér-mino pactado debe ser moderado y debe existir una corre-lación entre los costes en que se incurrió y el término impuesto. Finalmente, el acuerdo de reembolso deberá constar por escrito.
Establecidos los requisitos de una cláusula de reem-bolso, pasemos a aplicarlos a los hechos concretos de este caso.
*479 V
Como habíamos señalado, el señor Nieves suscribió un acuerdo de empleo con Oriental Financial en el 1997 para desempeñarse como corredor de inversiones. Previo a esa fecha, Nieves no tenía experiencia en este negocio ni poseía una licencia para desempeñarse como tal. En atención a lo cual, Oriental Financial se comprometió contractualmente a pagar el adiestramiento necesario para que Nieves pu-diese obtener su licencia de corredor de valores. Las partes acordaron que el valor del adiestramiento ascendía a $60,000. El contrato dispuso también que si el señor Nieves renunciaba a su empleo dentro del término de cuatro años luego de suscrito, éste tendría que reembolsar cierta cantidad a Oriental Financial en repago del adiestra-miento recibido.
Al analizar la cláusula en cuestión debemos señalar, como cuestión de umbral, que el adiestramiento ofrecido a Nieves es, en efecto, el tipo de adiestramiento especiali-zado cuyos costes pueden recobrarse. La industria de valo-res es altamente especializada y regulada que requiere la obtención de una licencia para trabajar como corredor de valores.(12) Véase 10 L.P.R.A. see. 861 et seq. Además, y como señalamos, Nieves no tenía experiencia en este tipo de negocios, así como tampoco contaba con la licencia re-querida para emplearse como corredor de valores. Con lo cual, el adiestramiento recibido le permitió a Nieves adqui-rir, para todos los efectos, una nueva profesión, a saber: *480 corredor de inversiones. Es conveniente señalar que este tipo de arreglo es usual en esta industrial.(13)
Por otro lado, Oriental Financial le pagó a Nieves la cantidad de $1,500 mensuales durante los seis meses en que éste se dedicó a adiestrarse y educarse como corredor de valores. No hay duda entonces que, en principio, proce-día el reembolso de los costes reales en que incurrió Oriental Financial.
Como recordaremos, habíamos advertido que los costes que pueden recobrarse son aquellos que razonablemente guarden relación con los costes en que verdaderamente in-currió el patrono. Debemos determinar, entonces, si la can-tidad de $60,000 guarda relación con los costes en que in-currió Oriental Financial en el adiestramiento de Nieves. Para ello, citamos extensamente del testimonio del Sr. José Fernández Martínez, vicepresidente sénior de Oriental Financial Group y presidente de Oriental Financial Services, quien testificó sobre este particular.
A preguntas de la representación legal de Oriental Financial, el señor Fernández indicó lo siguiente, y citamos extensamente:
LCDO. ALFREDO FERNÁNDEZ MARTÍNEZ: Ok. Le pre-gunto, ¿qué razón, si alguna existe, llevándolo a la página seis de ese contrato, para la inclusión de la cláusula 6.5 de ese contrato?
TESTIGO JOSÉ RAFAEL FERNÁNDEZ: La cláusula 6.5 bá-sicamente lo que nosotros hemos hecho es establecer, un costo mínimo de lo que significa desarrollar, entrenar, convertir en un profesional de planificación financiera a un individuo que realmente tiene un potencial, no tiene la experiencia, no tiene las licencias, no tiene un entrenamiento en ventas, no tiene contactos, no tiene la credibilidad en la calle, y nosotros pues *481 tenemos que hacer una inversión sustancial en esa persona, no solamente en dólares, sino también en tiempo, en tiempo de visitar a un cliente, en presentación en diferentes foros ya sea seminarios, programas radiales, programas de televisión, en la prensa, en conferencias, en convenciones, para poder levan-tar la credibilidad del individuo para cuando llegue a posicio-narse como lo que queremos que se posicione que sea planifi-cador financiero tenga la madurez, la credibilidad, el ‘standing’, la confianza en sí mismo, para poder verdadera-mente ofrecer lo que necesita el cliente en ese momento, ya sea algún tipo de inversión o asesoría en planificación financiera
LCDO. ALFREDO FERNÁNDEZ MARTÍNEZ: Sr. Fernández, ¿qué tipo de inversión hizo Oriental Financial Services en la contratación del Sr. Nieves?
TESTIGO JOSÉ RAFAEL FERNÁNDEZ: Específicamente en la contratación del Sr. Nieves, pues fue un poquito, diría, lo que podemos decir es, yo puedo decirte o le puedo decir a us-tedes, cuanto (sic) es el valor que nosotros le adjudicamos.
LCDO. ALFREDO FERNÁNDEZ MARTÍNEZ: ... ¿[Q]ué tipo de inversión y en qué consistió la inversión que hizo Oriental Financial Services al contratar al Sr. José Juan Nieves para la de financiero o de broker?
TESTIGO JOSÉ RAFAEL FERNÁNDEZ: El mismo tipo de inversión que se hace con cualquier otra persona que viene sin experiencia a trabajar o a querer trabajar como corredor de valores o como planificador financiero en Oriental Finacial Services, y eso conlleva un gasto aproximado de por lo menos $100,000.00 dólares.
LCDO. ALFREDO FERNÁNDEZ MARTÍNEZ: ¿Y en qué consist© ©s© gasto^
TESTIGO JOSÉ RAFAEL FERNÁNDEZ: Ese gasto consiste primero en las licencias, conseguir las licencias, para poder conseguir la licencia tiene que coger unos entrenamientos y tener que pasar unos exámenes, tiene que coger unos exáme-nes, unos exámenes que requiere el Nacional Asociation [sic] Security Leaders [sic], ... [H]ay que pagar los gastos de los reguladores ... y ... luego de que pasa el examen se incurren en unos gastos de entrenamiento ya sea operacional para que conozca como [sic], cuáles son realmente los problemas que pueden ocurrir en el negocio de planificación financiera para que cuando le suceda a uno de sus clientes él sepa como [sic] atenderlo y lo ponemos a trabajar en la parte de operaciones por un tiempo.
LCDO. ALFREDO FERNÁNDEZ MARTÍNEZ: Y Sr.'Fernán- *482 dez, ¿quién, cómo se establece o se calcuela esa suma de $60,000 en el párrafo 6.5 del contrato?
TESTIGO JOSÉ RAFAEL FERNÁNDEZ: Realmente ha sido impredecible y tratando de ser lo mas justo posible, decidimos que queremos recobrar nuestra inversión, al menos parcial-mente y creemos que dándole un periodo de cinco años a esta persona para que trabaje con nosotros luego de nosotros de-pende básicamente de un año, año y medio iniciales de un periodo [de] entrenamiento, donde para nosotros, nosotros no recobramos la inversión de un corredor que no tiene experien-cia y que tiene por su licencia, no recobramos la inversión al menos que esa persona este [sic] produciendo para, en algún momento más de de $300,000 dólares en comisiones, hay [sic] es que empezamos a recobrarlos, si la persona el primer año y el segundo año tiene una producción, vamos a llamarle razo-nable para ese primer año, yo la llamaría un [sic] producción de $120 a $125,000 dólares de comisiones, pues al tercer año tiene que estar ya produciendo entre 250 y 300 para recobrar nosotros nuestra inversión, al nosotros hacer ese análisis de-cimos, bueno si se va el primer año hemos invertido la gran cantidad de tiempo, dólares y esfuerzo en crear unas [sic] cre-dibilidad y un bagaje profesional, para esta persona, pues si esta persona se va el primer años [sic] nos tiene que reemobol-sarnos [sic] a nosotros por lo menos parte de la inversión y hay [sic] es que esta [sic] la escena de los 60,000 dólares y obvia-mente lo que hacemos es un prorrateo [de] cinco años la persona no tenga esa carga que alguno, que al [sic] personas po-drían considerarla pero en el caso nuestro lo consideramos como algo bien justo y razonable luego de la inversión que se ha hecho, y demás esta decir, actualmente tenemos corredores en nuestra firma qué pasaron por ese proceso. Transcripción, Apéndice de la Petición de certiorari, págs. 366-374.
A poco que analicemos el testimonio antes transcrito nos percatamos que de éste no se desprende, verdaderamente, cómo se computó la cantidad de $100,000 o los $60,000. En la primera parte de su testimonio, el señor Fernández ex-plica a grosso modo en qué consiste “desarrollar entrenar, convertir en un profesional de planificación financiera” a una persona sin experiencia en esta industria. Describiendo el tipo de actividad que la empresa fomenta para, con éstas, “levantar la credibilidad del individuo” en su relación con el cliente. Somos de criterio que el testimonio sobre este parti *483 cular fue impreciso, en la medida que no nos permite impar-tir certeza al valor adscrito al adiestramiento ofrecido. La aseveración conclusiva de que la inversión en el adiestra-miento “conlleva un gasto aproximado de por lo menos $100,000”, sin más, se revela insuficiente para validarla.
El expediente en este caso está huérfano, por ejemplo, de estudios, análisis o informes de cuántas horas un em-pleado en adiestramiento le dedica a algunas de las activi-dades que se enumeran, así como tampoco hay información sobre el costo en horas/personas que ello conlleva. Tampoco hay evidencia del tiempo que le dedica la empresa a moni-torear o supervisar el trabajo del nuevo empleado y el coste que ello supone en horas/personas. Es decir, no hay eviden-cia empírica que nos permita validar el monto asignado al adiestramiento ofrecido. Si bien el señor Fernández testi-ficó sobre el adiestramiento operacional, de ventas y de servicios así como de los distintos productos ofrecidos por Oriental Financial que recibiera Nieves de parte de distin-tos oficiales de la organización, no sabemos qué tiempo ello representa ni el valor en horas/personas que se le puede adscribir, o cualquier otro costo, directo o indireto, que ello hubiese representado. Transcripción, Apéndice de la Peti-ción de certiorari, págs. 369-370.
En resumen, si bien hubo testimonio descriptivo de en qué consistió el adiestramiento ofrecido, no existe informa-ción objetiva que permita con algún grado de certeza o pre-cisión, adscribirle un valor monetario a ese adiestramiento. Como ya indicamos, el monto de reembolso procede sólo en la medida en que guarde relación con los costes en que verdaderamente incurrió el patrono.
Por otro lado, a la pregunta específica de cómo se llegó a la cantidad de $60,000, observamos que la respuesta del señor Fernández va dirigida a explicar el tiempo necesario para recuperar la inversión, utilizando como base las comi-siones que generará el empleado en los años subsiguientes al adiestramiento. La explicación del señor Fernández po- *484 dría justificar el término incluido en una cláusula de reem-bolso, pues a eso va dirigido, pero ciertamente no explica cómo se llegó a la cantidad del reembolso.
En vista de lo anterior, y a la luz del récord ante nuestra consideración, somos del criterio que no se probó que los costes imputados —$60,000— guardasen relación directa con los gastos en que verdaderamente incurrió Oriental Financial en adiestrar al señor Nieves. La evidencia que consta en autos es insuficiente para validar la cantidad de $60,000 que se le adscribió al adiestramiento recibido por Nieves.
Antes bien, hay ciertos costes sobre los cuales no existe controversia alguna; específicamente, nos referimos a los gastos en que incurrió Oriental Financial durante los pri-meros seis meses de trabajo de Nieves cuando ésta le pagó una mensualidad ascendiente a $1,500 “con el objetivo de que se concentr[e] en entrenarse como ... corredor”. Trans-cripción, Apéndice de la Petición de certiorari, pág. 371. Así, tampoco hay controversia en cuanto al costo por el seminario a que acudió Nieves en Florida y que fue sub-vencionado por Oriental Financial. Estos gastos ascienden a, aproximadamente, $10,000. Habiendo trabajado Nieves para Oriental Financial por espacio de tres años, dicho tér-mino es suficiente para que ésta recuperase la inversión hecha mediante las ganancias generadas por Nieves para la empresa.
En virtud de lo anterior, resolvemos que el monto de reembolso reclamado por Oriental Financial es improce-dente por cuanto no se puede fijar con precisión la totali-dad de lo reclamado. No empece lo anterior, hay ciertos costes, conforme enumeramos, cuyo reembolso podía reclamarse. No obstante, somos del criterio que Oriental Financial había recuperado ya esa inversión, de natura-leza cuantificable, al momento en que Nieves concluyó su empleo para la empresa. (14) A esos efectos, se dictará sen- *485 tencia para modificar la sentencia dictada por el Tribunal de Apelaciones.

Se dictará sentencia de conformidad.

El Juez Asociado Reñor Rebollo López hace constar que “[n]o obstante estar conforme con la norma que se esta-blece en la decisión emitida, disiente; ello por entender, contrario a la Mayoría y ante la ausencia de prueba en contrario, que la evidencia presentada por la parte deman-dante —respecto a la corrección y procedencia de la suma de $60,000 a la que se alude en la Cláusula 6.5 del contrato otorgado entre las partes— es suficiente en Derecho. Con-forme nuestra jurisprudencia, este Tribunal no tiene auto-ridad para ignorar dicha prueba, actuación que, lamenta-blemente, resulta ser arbitraria”. El Juez Asociado Señor Rivera Pérez disintió sin opinión escrita. El Juez Asociado Señor Fuster Berlingeri no intervino.

 La Cláusula 5.4 del contrato de empleo suscrito entre las partes disponía que cualquier disputa o controversia relacionada con el contrato habría de someterse a arbitraje. No obstante, ninguna de las partes ha invocado en momento alguno el arbitraje. Por ello, somos del criterio que con sus acciones las partes han acordado dejar sin efecto este mecanismo de solución de controversias.

 Para una discusión más abarcadora, véanse: Bishara, Covenants not to compete in a knowledge economy: Balancing innovation from employee mobility against legal protection for human capital investment, 27 Berkeley L. Emp. & Lab. L. 287 (2006); Gely y Breman, The Law and Economics of Employee Information Exchange in the Knowledge Economy, 12 Geo. Mason L. Rev. 651 (2004); K.V.W. Stone, Knowledge at Work: Disputes over the ownership of Human Capital in the Changing Workplace, 34 (Núm. 3) Conn. L. Rev. 721 (2002); R.S. Amow-Richman, Bargaining for Loyalty in the Information Age: A Reconsideration of the Role of Substantive Fairness in Enforcing Employees Noncompets, 80 (Núm. 4) Or. L. Rev. 1163 (2001).

 El professor Bishara, supra, pág. 296, indica: “Employers are aware that the quality of a business’s employees is an inescapable component of a business’s success and is worth fighting to protect. Business efficiency and profitability are driven by effective hiring, training, and retention of productive employees. Investors, too, realize that the value of many corporations is not fully reflected on their balance sheet. This is because the value of many of today’s companies, particularly high-tech companies and other knowledge-based industries, is tied up in the creative services provided by the human capital of their employees, not by physical assets that can be owned, sold or leveraged.” (Énfasis nuestro.)

 Stone, supra, pág. 735 (“Clearly, one of the most important elements in the new employment relationship is the promise of training that will enable employees to develop their human capital”).

 La profesora Stone, supra, págs. 722-723, describe con precisión este con-flicto:
“As firms and employees have come to recognize the enormous value of employee human capital, disputes over ownership of human capital have increased. Such conflicts may well be endemic to the information-based workplace, in which the unique nature of human capital defies simple legal categorization. Employees bring knowledge and capabilities to their jobs and expect that their jobs will further increase their human capital, whether by providing experience and learning on the job, or by providing more formal training opportunities ... as one of the benefits of the job. Jobs are often evaluated and selected on the basis of whether and how much opportunity for learning and skill enhancement is provided. Accordingly, employees assume that the skills and knowledge they acquire on a particular job ‘belong’ to them in the sense that they take these with them when they depart.
“Employers, on the other hand, believe that if they have imparted valuable skills or knowledge to their employees, they should ‘own’ that human capital in the sense of being able to ensure that it is utilized on their firm’s behalf.” (Escolio omitido.) Véase, además, Sánchez Caso, El contrato de mordaza: apuntes sobre el acuerdo de confidencialidad en una relación de empleo, 39 Rev. Jur. U.I.RR. 811 (2005).

 Véase, en general, M.J. Godreau Robles, Lealtad y Buena Fe Contractual, LVTII (Núm. 3) Rev. Jur. U.P.R. 367, 379 (1989). Con respecto a las relaciones pre-contractuales, véanse: Colón v. Glamourous Nails, 167 D.P.R. 33 (2006); RBR Const., S.E. v. A.C., 149 D.P.R. 836 (1999); Torres v. Gracia, 119 D.P.R. 698 (1987); Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517 (1982). Véase, con respecto a la interpre-tación de los contratos: Municipio Mayagüez v. Lebrón, 167 D.P.R. 713 (2006); Negrón Rivera y Bonilla, Ex parte, 120 D.P.R. 61, 75 (1987); Ramírez, Segal & Látimer v. Rojo Rigual, 123 D.P.R. 161, 174-175 (1989). Sobre el cumplimiento, véanse: Arthur Young & Co. v. Vega III, 136 D.P.R. 157, 170-171 (1994); Ramírez v. Club Cala de Palmas, 123 D.P.R. 339 (1989). Con respecto a la modificación del contrato, véanse: López de Victoria v. Rodríguez, 113 D.P.R. 265 (1982) (sentencia), citada con aprobación en Marcial v. Tome, 144 D.P.R. 522, 536 (1997), y en Méndez v. Morales, 142 D.P.R. 26, 35 (1996); Util. Cons. Servs. v. Mun. de San Juan, 115 D.P.R. 88 (1984) (sentencia), citada con aprobación en Levy v. Aut. Edif. Públicos, 135 D.P.R. 382, 395 (1994).

 Para una discusión más abarcadora, véase C. Zeno Santiago y V. Bermúdez Pérez, Tratado de Derecho del Trabajo, San Juan, Pubs. JTS, 2003, T. I, Cap. 10.

 Como indicamos anteriormente, el Tribunal de Apelaciones catalogó el con-trato o cláusula que interpretamos como un pacto de permanencia de acuerdo con la legislación española prevaleciente y procedió, entonces, a aplicarle los requisitos de dicha legislación al acuerdo aquí impugnado. Véase J. Cruz Villalón y J. Maetzu Gregorio de Tejada, Estatuto de Trabajadores, 3ra ed., Madrid, Ed. léenos, 1986, T. I, Art. 21.4, págs. 67-68. La figura del pacto de permanencia no aplica a esta controversia. En lo que se refiere al derecho laboral, “[l]a fórmula civilista española no responde al desarrollo y enfoque de la legislación laboral de Puerto Rico. En nuestro derecho laboral todo trabajador tiene un derecho constitucional a renunciar libremente a su empleo. Este derecho le permite poner fin a su ocupación y a dedi-carse a otra, en cualquier momento. ... El derecho laboral español no favorece que un trabajador renuncie libremente a su oficio”. Zeno Santiago y Bermúdez Pérez, op. cit., pág. 227. Véanse, además: N. Sirvent Hernández, El pacto de permanencia en la empresa, Valencia, Ed. Tirant lo blanch, 2002, págs. 53-59; M. Rubio de Medina, El pacto de permanencia en la empresa, 20ma ed., Barcelona, Ed. Bosch, 2005; A. Montoya Melgar, Derecho del Trabajo, Madrid, Ed. Tecnos, 1999, pág. 456. Esta diferen-cia, de naturaleza sustantiva, nos impide extrapolar la figura proveniente del Dere-cho español a la controversia de autos.

 En tal sentido se ha indicado lo siguiente:
“Before investing in training, employers undoubtedly will have performed a cost-benefit analysis to assess the profit potential from such an investment. In fact, back-end computing software available to most companies facilitates this process. Companies that use this type of software can also evaluate how their human resources are generating revenue for the business through the use of such training. ... Thus, because the employer would have the ability to compute the cost of training and the revenue generated from that employee’s use of training, the employer can also determine when it has broken even. With this information, the employer should be able to generate a repayment plan that accurately predicts the amount to be repaid by the employee at each stage of his employment should he choose to leave the firm. If designed properly, the repayment amount at each step would reflect the break-even point at which the employee’s repayment would fully compensate the employer.” B.S. Long, Protecting Employer Investment in Training: Noncompetes v. Repayment Agreements, 54 (Núm. 5) Duke L.J. 1295, 1318-1319 (2005). Véase, ade-más, Oracle, Oracle E-Business Suite, en www.oracle.com/applications.

 En Wilson v. Clarke, 470 F.2d 1218, 1223 (1er Cir. 1972), el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito indicó sobre este particular:
“Doubtless an employer who has provided specialized training to an employee — as by a course of studies or the like might reasonably contract with the employee for reimbursement if the employee should quit before the employer achieves any benefit. However, the employer may not require its ex-employee to make payment to it unrelated to the employer’s damage, simply as a penalty to discourage or punish a job change.”

 El profesor Bishara, supra, pág. 301, describe este doble daño de la manera siguiente:
“If the employee is imbued with value transferred from the first employer and fully takes it to a second employer, then the first employer is arguably double harmed. First it loses out on some of the return on its investment in the employee and has to start training a new person. ... Second, it is harmed because the employee is now aiding a competitor by capitalizing on the very human capital the first firm ‘paid’ to develop. Moreover, the competitor reaps the reward of hiring a trained employee without investing in training.”

 Se ha indicado que para cumplir con el requerimiento de “adiestramiento especializado”, el patrono tiene que demostrar lo siguiente: “the employer must demonstrate that the training and education provided, and the skills and knowledge imparted thereby, were highly specialized, and as a result of this highly specialized training and education, the employee acquired singular skills and knowledge, or obtained an enhanced degree of sophistication, competency, and erudition in existing skills and knowledge. The fact that the employee, as a result of the training, was able to secure a government license or certification, especially in a heavily regulated industry, will be an important point.” (Énfasis nuestro.) Cavico, supra, pág. 99.

 Véase, Pamela Savage Forbat, Indenture Servitude, noviembre de 1997, www.registeredrep.com/mag/finance_indentured_servitude/. Allí se indica, por ejem-plo, que Smith Barney le adjudica un valor de $45,000 a sus costes de adiestra-miento, Prudential Securities lo estima en $39,000, Merill Lynch en $38,000 y Paine Webber (ahora UBS) en $40,000. El término de años para estos acuerdos de reem-bolso oscilaba entre dos a cuatro años.

 Puntualizamos que no estamos pasando juicio sobre la razonabilidad del *485 plazo de cuatro años pactado en el contrato suscrito entre Oriental Financial y el señor Nieves. El resultado a que llegamos hoy, a saber, que Oriental Financial no justificó adecuadamente el monto del reembolso reclamado, hace innecesario en esta ocasión una evaluación sobre la razonabilidad del término dispuesto contractualmente.